USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:_____
DATE FILED:__10/3/2016__

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

-------------------------------------------------------------- X

IN RE:                                              :
                                                    :
                                                    :          14-MD-2548 (VEC)
                                                    :
COMMODITY EXCHANGE, INC., GOLD                      :          **OPINION AND ORDER**
FUTURES AND OPTIONS TRADING                         :
LITIGATION                                          :
                                                    :
                                                    :
*This Document Relates to All Actions*              :

-------------------------------------------------------------- X

       The Complaint in these consolidated cases, which involve the alleged manipulation and

suppression of gold prices during the period from January 1, 2004 to June 30, 2013 (the "Class

Period"), suggests that in the era of supercomputers, big data, and sophisticated statistical

analyses, it may be very difficult to hide illegal conduct that might otherwise have escaped

detection.  On the other hand, it also brings to mind a quip attributed to Benjamin Disraeli --

there are three kinds of lies: lies, damn lies and statistics.  Whether the detailed statistical

analyses contained in the Complaint reveal ground truth about the activities of the Defendant

banks who participated in the Gold Fix or are on the "lies, damn lies and statistics" side of the

dichotomy remains to be seen.

       The Defendants in this case are UBS AG and UBS Securities LLC (together, "UBS");

The London Gold Market Fixing Ltd. ("LGMF"); and the five LGMF fixing banks during the

Class Period: The Bank of Nova Scotia ("BNS"),[1] Barclays,[2] Deutsche Bank,[3] HSBC,[4] and

Société Générale[5] (collectively, the "Fixing Banks").  Plaintiffs are individuals and entities that

sold physical gold, gold futures traded on the Commodity Exchange, Inc. ("COMEX") market,

shares in gold exchange-traded funds ("ETFs"),[6] or options on gold ETFs during the Class

Period.

Seeking to recover losses suffered as a result of Defendants' alleged manipulation and

suppression of the price of gold through the gold "fixing" process, Plaintiffs bring putative class

action claims for (1) unlawful restraint of trade in violation of Section 1 of the Sherman Act, 15

U.S.C. § 1 *et seq.*; (2) market manipulation in violation of the Commodity Exchange Act

("CEA"), 7 U.S.C. §§ 1 *et seq.* and CFTC Rule 180.2; (3) employment of a manipulative or

deceptive device and false reporting in violation of the CEA, 7 U.S.C. §§ 1 *et seq.* and CFTC

Rule 180.1; (4) principal-agent liability in violation of the CEA, 7 U.S.C. §§ 1 *et seq.*; (5) aiding

and abetting manipulation in violation of the CEA, 7 U.S.C. §§ 1 *et seq.*, and (6) unjust

enrichment.

---

[1]        Named entities include Bank of Nova Scotia and its subsidiaries and affiliates, including ScotiaMocatta.

[2]        Named entities include Barclays Bank plc and its subsidiaries and affiliates, including Barclays Capital Inc.

[3]        Named entities include Deutsche Bank AG and its subsidiaries and affiliates, including Deutsche Bank Securities Inc.  On April 14, 2016, Plaintiffs notified the Court that they had reached a settlement with Deutsche Bank, although no motion for approval of a Settlement Class has yet been presented to the Court.

[4]        Named entities include HSBC Holdings plc and its subsidiaries and affiliates, including HSBC Securities (USA) Inc. and HSBC Bank USA.

[5]        Named entities include Société Générale SA and its subsidiaries and affiliates, including Newedge USA, LLC.

[6]        Gold exchange-traded funds invest solely in gold bullion and issue shares that are directly linked to spot gold prices and that can be traded via exchange.  Second Consolidated Amended Class Action Complaint ¶¶ 102-03.

On July 22, 2014, the Court appointed Quinn Emanuel Urquhart & Sullivan, LLP and Berger & Montague P.C. as interim class co-counsel.  *See Maher v. Bank of Nova Scotia et al.*, 14-cv-1459 (S.D.N.Y.) (VEC), Dkt. 29.  On August 13, 2014, the United States Judicial Panel on Multidistrict Litigation transferred one case from the Northern District of California to this Court for "coordinated or consolidated pretrial proceedings" along with other cases that had been filed in this District.  *In re Commodity Exch., Inc., Gold Futures & Options Trading Litig.*, 38 F. Supp. 3d 1394, 1395 (J.P.M.L. 2014); *see also* 28 U.S.C. § 1407.  Discovery was stayed by the Court in these consolidated actions on October 20, 2014.  Dkt. 22.[7]  On March 16, 2015, Plaintiffs filed a Second Consolidated Amended Class Action Complaint (the "SAC"), Dkt. 44. Defendants have moved to dismiss the SAC through three separate motions, the first filed by UBS, Dkt. 71, the second filed by the Fixing Banks, Dkt. 73, and the third filed by LGMF, Dkt. 75.  For the following reasons, the Fixing Banks' Motion to Dismiss is GRANTED IN PART and DENIED IN PART, UBS's Motion to Dismiss is GRANTED, and LGMF's Motion to Dismiss is GRANTED IN PART and DENIED IN PART.

## BACKGROUND[8]

### I.    The LGMF Gold Fixing

London's gold market (now known as the "London Bullion Market") has been the center of the global market for gold since the late 1800s.  SAC ¶ 93. Trading within the London Bullion Market, which operates on an over-the-counter basis, 24-hours a day, is the "indisputable international standard for gold and silver dealing and settlement."  *Id.* ¶¶ 94-95.

---

[7]    Unless otherwise noted, citations to the docket shall be to the MDL case docket for these consolidated actions, 14-md-2548.

[8]    The facts are taken from the Second Amended Complaint.

The London gold fixing process (the "Fixing" or the "Gold Fixing") has been integral to price-setting and trading on the London Bullion Market and the various gold markets around the world since 1919.  *Id.* ¶¶ 77, 96.  Historically, the purpose of the Fixing was to determine a daily benchmark price for one troy ounce of "Good Delivery"[9] gold at a specified time during the London trading day.  *Id.* ¶ 76.  Because there is no single forum for trading gold and gold-related investments, the price determined through the Gold Fixing (the "Fix Price") is intended to provide an objective price point for gold producers, consumers, investors, derivatives traders, and central banks, and has thus become "the dominant price benchmark for the world's gold trading."  *Id.* ¶ 77.  Unlike many alleged price-fixing conspiracies, the fact that the Fixing Banks met daily to fix the price of gold was known to all market participants.

At all times during the Class Period, the Gold Fixing took place each business day at 10:30 A.M. (the "AM Fixing") and 3:00 P.M. (the "PM Fixing") London time.  *Id.* ¶¶ 1 n.1. During the Class Period, the Fixing was administered by the Fixing Banks, operating collectively through LGMF.  *Id.* ¶¶ 79, 84.  Founded in 1994, LGMF is a private company organized and based in the United Kingdom.  *Id.* ¶¶ 72-73.  Throughout the Class Period, LGMF was owned and controlled by the Fixing Banks.[10]  *Id.* ¶ 72.

Throughout the Class Period, the Gold Fixing was conducted through a "Walrasian" auction.  *Id.* ¶ 81.  Leading up to the Fixing, the Fixing Banks would receive buy and sell orders from clients and then combine those orders with orders from their own proprietary trading desks to come up with an aggregate buy or sell position at a particular spot price.  *Id.* ¶ 316.  At the

---

[9]     "Good Delivery" gold refers to gold that meets certain quality standards and is used for settling transactions in the London Bullion Market.  *Id.* ¶ 93.

[10]     Defendant Deutsche Bank was a LGMF member until May 2014 when it resigned its seat after trying, but failing, to sell the seat to another institution in the wake of an investigation by German regulators into potential manipulation in the precious metals markets.  *Id.* ¶¶ 22, 279.

outset of the auction, which took place via private teleconference, the chair (a position that rotated among the Fixing Banks) would provide an opening price, which constituted the current prevailing spot price for gold at the start of the call. *Id.* ¶¶ 81-82, 315. Each of the Fixing Banks would then announce how many bars of gold they wished to buy or sell at that price based on the net supply or demand for spot gold from their order books. *Id.* ¶¶ 82, 316. If there was no buying or selling interest, or if buying and selling interest were roughly equivalent, the chair could announce the price of gold as "fixed." *Id.* ¶ 82. Otherwise, the chair would adjust the price upward or downward until buying and selling interest reached a rough equilibration, within 50-bars. *Id.* Once the chair declared the price as "fixed," the Fix Price would then be sent to the London Bullion Market Association for publication. *Id.* ¶ 82. During the Class Period, no third-party administrator supervised the call; the call was unrecorded and no records of the Fixing Banks' communications were kept. *Id.* ¶ 236.

## II.     The London Bullion Market Association

The London Bullion Market Association ("LBMA") is a trade association that coordinates activities on behalf of its members, market-making members, and other participants in the London Bullion Market. *Id.* ¶¶ 86-90. The LBMA's members include major "bullion banks," such as the Fixing Banks and UBS, which function as suppliers and holders of physical gold. *Id.* ¶ 89. The LBMA's market-making members are responsible for quoting bid and offer prices in gold spot, future, and options during the London trading day. *Id.* ¶ 90. UBS and each of the Fixing Banks are LBMA market-makers responsible for offering quotes in one or more of spot gold, futures, and options, and each bank also holds a reserved seat on the LBMA management committee. *Id.* ¶¶ 90, 92. Defendants Barclays, BNS, Deutsche Bank, HSBC and UBS are also clearing members for the LBMA. *Id.* ¶¶ 91, 94 & n.15, 95.

In November 2014, after Deutsche Bank's resignation of its LGMF membership, *id.* ¶¶ 22, 279, and the LBMA's review of the Fixing process, a third-party entity, ICE Benchmark Administration ("IBA"), was selected to provide independent administration and governance for the Fixing. *Id.* ¶¶ 22, 85.  Since 2013, the LGMF has also adopted a conflict of interest policy and decided to appoint a "Supervisory Committee" to implement and enforce a code of conduct. *Id.* ¶ 274.

## III.     The Gold Market During the Class Period

Physical gold is sold on numerous over-the-counter venues and is the underlying asset in a variety of derivative and security investments, such as gold futures, forwards, options, and gold ETFs (collectively, along with physical gold bullion and gold bullion coins, "Gold Investments"). *Id.* ¶ 23 & n.13; Defs.' Mem. at 5 (citing Declaration of Stephen Ehrenberg, dated April 30, 2015, Ex. 2 (SPDR Gold Trust Prospectus, Apr. 26, 2012), at 15).  While liquidity in gold trading fora varies throughout the day, the periods of greatest liquidity are typically after the trading venues in the United States open, when "trading in the European time zones overlaps with trading in the United States."  Defs.' Mem. at 4 (citing Ex. 2 (SPDR Gold Trust Prospectus, Apr. 26, 2012), at 15).  Between 2004 and 2012, a bull market prevailed for gold, with the price of gold steadily increasing from approximately $400 per troy ounce to around $1800 per troy ounce.  SAC ¶ 110.

## IV.     The Impact of the Fix Price on Gold Investments

Plaintiffs allege that, although there is no centralized market for gold, the gold market operates efficiently in the sense that the Fix Price is immediately reflected in the price of "physical" gold as well as in the price of various other Gold Investments.  *Id.* ¶¶ 76, 309-10.  The Fix Price strongly correlates with the price of gold futures and options on futures contracts traded

on the COMEX, and, according to Plaintiffs, there was a 99.9% correlation between gold spot prices and futures prices during the Class Period. *Id.* ¶¶ 108-09, 309.  Similarly, pricing for gold ETF shares, which correlates closely with the spot price of gold, moved in tandem with the Fix Price during the Class Period, with a correlation co-efficient of 99.6%. *Id.* ¶¶ 103, 113, 309.

As a result, market participants rely on the Fix Price, and the Fix Price is often built into contracts governing gold-related investments.  For example, buyers and sellers of physical gold can contract to transact at the Fix Price at a specified future date. *Id.* ¶¶ 3, 97.  Likewise, gold derivatives, such as gold futures, forwards, and options contracts, including futures and options traded on COMEX, may be pegged to (settled at) the Fix Price, *id.* ¶¶ 98-99, and cash flows for many gold derivatives are calculated in reference to the Fix Price on a specified date, *id* ¶ 3.  The LBMA characterizes the Fix Price as the "globally accepted" benchmark, and the prospectus for the largest gold ETF, SPDR Gold Trust, states, "The Fix [Price] is the most widely used benchmark for daily gold prices and is quoted by various financial information sources." *Id.* ¶ 96.  According to a survey cited by Plaintiffs, the vast majority of LBMA participants base at least a portion of their gold trading on the Fix Price. *Id.* ¶ 107.  In this sense, the Fix Price is "inextricably intertwined" with the pricing of various Gold Investments and is a built-in component of many contracts governing gold-related investments. *Id.* ¶ 106.  Although Plaintiffs did not sell gold pursuant to contracts that were expressly pegged to the Fix Price, they argue that, because the Fix Price has a direct impact on pricing throughout the gold market, the Fixing Banks controlled a key factor in the pricing of Plaintiffs' Gold Investments throughout the Class Period. *Id.* ¶¶ 105-06, 323-24.

## V.     Allegations of Manipulation

At the heart of Plaintiffs' Complaint is the theory that the Fixing Banks, by virtue of their overt but non-public interactions in connection with the daily Gold Fixing, were uniquely positioned to effectively "name their own" Fix Price and thereby to gain an unfair advantage with respect to the contracts, derivatives, and physical positions that they held in the market, all of which were correlated to the Fix Price in one way or another. *Id.* ¶ 5.  In particular, Plaintiffs allege that Defendants were motivated to profit, and did in fact profit, from their intentional and coordinated suppression of the Fix Price around the PM Fixing, which had the effect of depressing prices for Gold Investments during the Class Period. *Id.* ¶ 115.

### A.  The Methods By Which Defendants Allegedly Manipulated the Fix Price

Plaintiffs allege that Defendants colluded artificially to suppress the price of gold in several ways.  First, leading up to the London PM Fixing, Defendants allegedly collected confidential client order information and then improperly shared that information amongst themselves in order to compare and coordinate the execution of particularly large sell trades, thereby driving down the gold spot price immediately before and during the Fixing call.[11]  *Id.* ¶¶ 8, 238-40, 243, 257 & chart.  In Plaintiffs' view, the Fixing call provided the perfect opportunity (and veneer of legitimacy) to enable the Fixing Banks privately to share order information and conspire to manipulate the Fix Price when it collectively suited them to do so. *Id.* ¶ 9.

---

[11]     Plaintiffs further allege that Defendants used manipulative trading tactics such as "spoofing" (sending false signals to the market by placing large orders that were never executed), "wash sales" (placing large orders that are executed and then quickly reversed) and "front running" of customer orders in order artificially to suppress the price of gold. SAC ¶ 8 n.2.  In support of these allegations, however, Plaintiffs' rely exclusively on various regulatory investigations and findings, discussed further *infra*, regarding the manipulation of foreign exchange and precious metals markets, generally, and the independent action of Barclays with respect to a single instance of price manipulation. *Id.* ¶¶ 283-308.

During the Fixing window itself, Plaintiffs allege that Defendants offered "rigged" auction rates that were either fabricated, *id.* ¶ 244, or artificially depressed by Defendants' prior coordination of large sell orders, which had the effect of magnifying a downward effect in the resulting Fix Price.  *Id.* ¶ 202.  Defendants also allegedly communicated with each other throughout the day through phone calls, chat rooms, and other forms of electronic communication to coordinate trading (including to "net off" large buy orders) in order to ensure that their efforts to drive down the gold price were not undone by counteracting trading activity. *Id.* ¶¶ 237-38.  Unlike other benchmark fixing cases, however, here Plaintiffs have no direct evidence of such communications.[12]

### B. Defendants Caused Price Distortions Around the Gold Fixing

In support of their claim that Defendants manipulated the Fix Price, Plaintiffs present data analyses demonstrating that pricing behaved in what they characterize as distinctive or "anomalous" ways around the PM Fixing.  A basic premise of Plaintiffs' argument is that, absent collusion or manipulation, trading around the PM Fixing would have been "random" in the sense that gold prices would have been equally likely to move up or down around the PM Fixing.  *Id.* ¶¶ 124, 178.  Instead, from 2001 through 2012, the spot price of gold moved downward around the Gold Fixing much more frequently than it moved upward.  *Id.* ¶¶ 7, 21 & chart.  Plaintiffs present analyses of data purporting to show that, in every year from 2001 through 2012, the spot price of gold decreased during the PM Fixing on at least 60-75% of the aggregate annual trading days, an occurrence that is statistically highly improbable under circumstances where the chances of a price increase or decrease are roughly equal.  *Id.* ¶¶ 21, 123-25 & charts.  In

---

[12]       *See, e.g.*, *In re Foreign Exch. Benchmark Rates Antitrust Litig.*, 74 F. Supp. 3d 581, 592 (S.D.N.Y. 2015); *Laydon* v. *Mizuho Bank, Ltd.*, No. 12-cv-3419, 2014 WL 1280464 (S.D.N.Y. Mar. 28, 2014), Dkt. 150-9; *In re LIBOR-Based Fin. Instruments Antitrust Litig.* (*LIBOR I*), 935 F. Supp. 2d 666, 681 (S.D.N.Y.) *rev'd Gelboim v. Bank of Am. Corp.*, 823 F.3d 759 (2d Cir. 2016).

addition, from 2000-2012, the incidence of days on which the PM Fix Price was lower than the prevailing spot price immediately prior to the beginning of the Fix call was much higher than the incidence of days in which the price of gold dropped overall. *Id.* ¶¶ 127 & n.27, 128.  Plaintiffs further highlight data showing that, from 2007-2013, the Gold Fixing was the only time of day when gold prices showed statistically significant negative returns (downward price movements), with the largest swing occurring at the PM Fixing. *Id.* ¶ 154.

In addition to the frequency of downward price swings at the PM Fixing, from 2006 through 2012, downward spikes around the PM Fixing were significantly more intense than other price swings observed throughout the trading day. *Id.* ¶¶ 138, 149-153 & App. D, App. G.  In addition, when the Fix Price went down at the PM Fixing, it decreased significantly more than it increased when it went up. *Id.* ¶¶ 7, 133-35 & chart.  For example, the PM Fix Price was in the lowest 5th percentile of gold pricing throughout the day twice as often as one would expect if large price increases were as likely as large price declines. *Id.* ¶¶ 132-35.  Notably, these dramatic swings occurred only around the PM Fixing; during the AM Fixing, there were actually fewer price swings than would otherwise be expected under random conditions. *Id.* ¶ 146 & chart.  Plaintiffs further allege that, every year during the Class Period, downward movement in the price of gold as measured by OTC prices occurred consistently, not only following the PM Fixing, but also in the minutes leading up to the PM Fixing, when the Defendants were allegedly coordinating their trading activities based on shared client order information. *Id.* ¶¶ 118, 138 & App. D.

In support of their allegations that Defendants were behind these distinctive or "dysfunctional" pricing patterns, Plaintiffs collected approximately 300,000 price quotes from the Defendants around the PM Fixing from 2001-2013 and found that Defendants' gold quotes

were consistently clustered together at price points that were lower than other market participants, by an average of .7 basis points (or .007%) from 2001 through 2012, and that Defendants' quotes were clustered together even more on days when the Fix Price moved downwards around the PM Fixing.  *Id.* ¶¶ 13, 202, 250-53 & chart, 256-257 & chart, 263. Finally, Plaintiffs identify several days during the Class Period when Defendants' quotes appear to have caused, or at a minimum correlated with, downward spikes in the PM Fixing.  *Id.* ¶¶ 261-67 & App. I.

According to Plaintiffs, these downward movements in the Fix Price caused gold prices to drop in both the spot and futures markets.  *See id.* ¶ 156 & chart & App. H (highlighting six trading days from 2009 through 2013 when spot and futures prices dropped at the PM Fixing). As a result, there was an average downward bias in intraday returns on COMEX gold futures of 4 basis points (or .04%) around the time of the PM Fixing from 2007 through 2013.  *Id.* ¶ 142 & chart.  In Plaintiffs' view, this demonstrates that Defendants' downward price manipulation was not merely episodic but had a persistent impact on the gold market from 2007-2013.  In 2013, when the major banks came under regulatory scrutiny related to their benchmarking practices, the pattern of downward spikes around the PM Fixing ceased so that the price of gold increased and decreased around the PM Fixing at a roughly equal rate, *id.* ¶ 124, and the pattern by which Defendants' price quotes were consistently clustered together at below-market prices around the PM Fixing also began to abate, *id.* ¶ 254.[13]

Plaintiffs claim that the frequency, intensity, and timing of these downward price movements, combined with the facts that (1) Defendants' quotes correlate with the downward trends and (2) gold prices moved downwards at the Gold Fixing even against upward market

---

[13]     Plaintiffs fail, however, to offer an explanation for why the pattern of downward swings around the PM Fixing returned in 2014.  *Id.* ¶ 170 & chart.

trends, leads to a strong inference that Defendants intentionally caused these downward price movements through coordinated price manipulation. *Id.* ¶¶ 116-57, 250-67.

**C.  Defendants Profited From Manipulating the Fix Price**

Plaintiffs propose two related theories as to how Defendants profited from their alleged conspiracy to suppress the Fix Price.  First, Plaintiffs generally allege that Defendants used their foreknowledge of downward swings in the Fix Price to make advantageous trades across a variety of Gold Investments.  While Plaintiffs do not know the makeup of each Defendant's gold portfolio, *id.* ¶ 208, they claim that Defendants maintained massive gold holdings, *id.* ¶¶ 203-05, in particular with respect to COMEX futures contracts, *id.* ¶ 216, and that the vast majority of the Defendants' derivative positions were held for active trading, rather than risk mitigation purposes, during the Class Period, *id.* ¶ 207.[14]  Despite individual differences in each of the Defendants' overall positions, their ability to control the Fix Price allegedly allowed them effectively to "reduce risk" from their gold investments in a way that was ultimately profitable for each of the Defendants individually and for the group as whole. *Id.* ¶¶ 197-98.

For example, Defendants allegedly used their control over the Fix Price to time their purchases and sales of physical gold to buy low and sell high. *Id.* ¶¶ 14, 230.  Defendants also allegedly used their control over the PM Fixing to profit from Fix Price-denominated derivative contracts to which they were parties; by manipulating the Fix Price, Defendants could influence the volume of cash flows between the respective parties in their favor. *Id.* ¶ 231.  Finally, Defendants' manipulation of the PM Fixing gave them an unfair advantage over counterparties that were not also Fixing Banks by reducing their risk in "digital options" and other contracts

---

[14]      Defendants point out, however, that the reports on which Plaintiffs rely for the premise that the majority of Defendants' derivative holdings were "active trading positions" actually reflect market-making positions that the Fixing Banks held to serve their clients.  Defs.' Mem. at 12 n.6.

with market-based triggers, such as "stop loss" orders and margin calls. *Id.* ¶ 232.  By manipulating the PM Fixing, Defendants were able to trigger (or avoid triggering) such orders or to make margin calls that otherwise would not have been made.  *Id.*

Plaintiffs' second theory is that Defendants were specifically motivated to suppress the Fix Price in order to profit from alleged massive net "short" positions that Defendants held in the gold futures market, including the COMEX market, throughout the Class Period.[15]  *Id.* ¶¶ 14, 115, 170.  Plaintiffs do not know Defendants' actual futures positions, but based on Commodity Futures Trading Commission ("CFTC") reports that compile, in an anonymized fashion, the calls, puts, and futures of all large bullion banks, Plaintiffs allege that, overall, these large banks, including Defendants, were net short in gold futures and options throughout the Class Period.  *Id.* ¶¶ 210-13.[16]  As a result, Plaintiffs argue that the Defendants, along with other large bullion banks, had an interest in suppressing the price of gold.  *Id.*  Plaintiffs argue that, even if Defendants were using short positions in COMEX futures for hedging purposes—that is to offset the risk of large holdings in physical gold or other "long" investments—they could benefit from driving the gold price down by cashing in on margin payments because futures are marked to market on a daily basis.  *Id.*  ¶¶ 218-221.

---

[15]      As with most futures contracts, most holders of gold futures do not settle their futures contracts at maturation; rather they offset their positions before expiry by purchasing contracts for an equal opposite position. *Id.* ¶ 100. As a result, the holders of "long" positions (who are obligated to purchase gold at an agreed-upon price in the future) profit when the price goes up because they are able to sell their offsetting contracts at a higher price. *Id.* In contrast, the holders of "short" positions (who are obligated to sell gold at an agreed-upon price in the future) profit when the price goes down because they are able to buy an offsetting contract for a lower price. *Id.* Gold forwards work in the same way, but are traded OTC as opposed to via an exchange. *Id.* ¶¶ 95, 99.

[16]      Aggregate data tells the Court little about the actual position of any particular Defendant. The fact that in the aggregate large bullion banks were net short does not mean that any given Defendant was net short consistently or even occasionally.

In support of this theory, Plaintiffs point to the existence of a "statistically significant" correlation between the net short futures positions of all large bullion banks on a given day and the likelihood that the Fix Price moved downward on the same day. *Id.* ¶ 225. Similarly, they argue, that downward spikes in spot prices around the PM Fixing occurred more frequently on the last trading days of the most active contract months for gold futures on the COMEX, when price movement would have the greatest impact on futures contracts.[17] *Id.* ¶ 227.

### D. Regulatory Investigations

To demonstrate that Defendants were capable of collectively profiting from illegal manipulation of the Gold Fixing process, Plaintiffs point out that many of the "world's leading banks" have either admitted to manipulation or have been subject to regulatory penalties for manipulating the LIBOR financial benchmark and for colluding to move markets with respect to foreign exchange ("FX") benchmarks, despite the fact that each bank had unique interests and positions on which fluctuations in the LIBOR and FX rates had a disparate impact. *Id.* ¶¶ 18, 304. For example, HSBC and UBS were fined by the CFTC and the U.K.'s Financial Conduct Authority ("FCA") for manipulating FX benchmarks, and Barclays has also been involved in settlement negotiations for its role in manipulating the FX markets. *Id.* ¶¶ 235, 304 n.93.[18]

---

[17]    Specifically, the SAC alleges that these downward spikes occurred "more frequently on days that would impact futures contracts the most." *Id.* ¶ 227. The SAC is ambiguous as to whether Plaintiffs intend to allege that the impact on gold futures was greatest on these days because the effect of the PM Fixing on individual futures contracts would be most pronounced or because on these days the PM Fixing would affect the greatest number of futures contracts. The Court assumes—for purposes of this decision—that it is the latter.

[18]    Since the filing of the SAC, Barclays has pled guilty to a criminal charge in the United States and paid various settlements and fines in connection with manipulation of the FX markets. *See, e.g.*, Steve Slater, *Barclays Fined $2.4 Billion for FX Manipulation, to Fire Eight Staff*, Reuters (May 21, 2015), http://uk.reuters.com/article/uk-banks-forex-settlement-barclays-idUKKBN0O51QX20150521; Greg Farrell, *Barclays Pays $150 Million to Settle New York Currency Probe*, Bloomberg (Nov. 18, 2015) http://www.bloomberg.com/news/articles/2015-11-18/barclays-pays-150-million-to-settle-new-york-currency-probe.

With respect to gold, Plaintiffs note that Defendants' FX desks were "closely related" to their precious metals desks, especially at UBS, *id.* ¶¶ 241, 99-300, and, therefore, argue that Defendants used the same types of manipulation to drive down gold prices around the PM Fixing as they used to manipulate the FX markets around the FX fixing window.[19]  *Id.* ¶¶ 240-41. FINMA, Switzerland's financial regulator, has found "clear attempts to manipulate fixes in the precious metals markets" (but not specifically gold), and highlighted collusion among UBS and "other banks" with respect to FX benchmarks.  *Id.* ¶ 19.  In addition, the United States Department of Justice ("DOJ") Antitrust Division, the CFTC, the FCA, the Swiss Competition Commission (WEKO) and the German financial regulator BaFin have all launched probes into the Gold Fixing, *id.* ¶¶ 20, 277, and DOJ and CFTC have investigated all the Defendants and issued subpoenas to at least Barclays and HSBC relating to their precious metals practices, *id.* ¶¶ 20, 277-78.  Plaintiffs acknowledge in the SAC, however, that the FCA and BaFin probes, which investigated only Deutsche Bank, have now been closed.  *Id.* ¶ 277 n.69.  During oral argument on the Fixing Banks' Motion to Dismiss, the Fixing Banks also pointed out that DOJ's Antitrust Division has also closed its investigation into alleged manipulation of the precious metals benchmarks.  Transcript of Oral Argument dated April 20, 2016 ("Tr.") at 15:13-16:2.

While no Defendants have been fined for conspiring with others to manipulate the Fixing, the FCA has fined Barclays, in part based on its finding that "Barclays was unable to adequately monitor what trades its traders were executing in the Fixing or whether those traders may have been placing orders to affect inappropriately the price of gold in the Fixing."  *Id.* ¶ 284.  The

---

[19]     Such practices include: giving "ammo" (building orders by transferring them between fellow conspirators), *id.* ¶ 239; "painting the screen" (placing fake orders to give the illusion of activity and then cancelling the orders when the fixing window closed), *id.* ¶ 242; "spoofing" (placing large orders that are never executed), *id.* ¶ 8 n.2; and "wash sales" (placing large orders that are executed then quickly reversed), *id.*

FCA highlighted a particular instance in which a Barclays trader purposefully drove down the

Fix Price by placing a large fictitious order that he did not intend to execute followed by a large

sell order to avoid triggering a digital option contract that that would have cost Barclays $3.9

million.  *Id.* ¶¶ 284-88.  Alleging that the Barclays trader's activity was not an isolated incident,

Plaintiffs point to press coverage stating that "there has long been an understanding among

[bullion banks] that sellers and buyers of digitals would try to protect their positions if the

benchmark price and barrier were close together near expiry."  *Id.* ¶ 292 n.84 (citing Xan Rice,

*Trading to influence gold price fix was 'routine*,*'* Financial Times (June 3, 2014),

http://www.ft.com/intl/cms/s/0/7fd97990-eb08-11e3-9c8b00144feabdc0.html#axzz3uzm9oKCf).

Other regulators and legislative bodies, including the United States Senate, have noted concerns

regarding potential "conflicts of interest" between the banks and their clients with respect to the

gold and other precious metals markets.  *Id.* ¶¶ 281-82, 302.

## DISCUSSION

### I.  **Legal Standard**

In evaluating a motion to dismiss, the Court must "'accept all factual allegations in the

complaint as true and draw all reasonable inferences in favor of the plaintiff.'"  *Meyer v.*

*JinkoSolar Holdings Co.,* 761 F.3d 245, 249 (2d Cir. 2014) (quoting *N.J. Carpenters Health*

*Fund v. Royal Bank of Scotland Grp., PLC*, 709 F.3d 109, 119 (2d Cir. 2013) (alterations

omitted)).  Nonetheless, in order to survive a motion to dismiss, "a complaint must contain

sufficient factual matter . . . to 'state a claim to relief that is plausible on its face.'"  *Ashcroft v.*

*Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)).

"Plausibility" is not certainty.  *Iqbal* does not require the complaint to allege "facts which can

have no conceivable other explanation, no matter how improbable that explanation may be."

*Cohen v. S.A.C. Trading Corp.*, 711 F.3d 353, 360 (2d Cir. 2013).  But "[f]actual allegations must be enough to raise a right to relief above the speculative level."  *Twombly*, 550 U.S. at 555, and "[courts] 'are not bound to accept as true a legal conclusion couched as a factual allegation,'" *Brown v. Daikin Am. Inc.*, 756 F.3d 219, 225 (2d Cir. 2014) (quoting *Twombly*, 550 U.S. at 555 (other internal quotations marks and citations omitted)).

## II.     Plaintiffs Have Constitutional Standing

Plaintiffs must establish both constitutional standing and, with respect to their antitrust claims, antitrust standing.  *Gelboim v. Bank of Am. Corp.*, 823 F.3d 759, 770 (2d Cir. 2016) (citing *Associated Gen. Contractors of Cal., Inc. v. Cal. State Council of Carpenters* (*AGC*), 459 U.S. 519, 535 n.31 (1983) (other citations omitted)).  To have constitutional standing, Plaintiffs must demonstrate that they have suffered an injury-in-fact that is "fairly . . . trace[able] to the challenged action of the defendant, and not . . . th[e] result [of] the independent action of some third party not before the court," and that is likely to be redressed by a favorable decision. *Carter v. HealthPort Techs., LLC*, 822 F.3d 47, 55 (2d Cir. 2016) (quoting *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560-61 (1992) (alterations in the original)).  With respect to the injury-in-fact element, Plaintiffs must have suffered "the invasion of a 'legally protected interest' in a manner that is 'concrete and particularized' and 'actual or imminent, not conjectural or hypothetical.'"  *In re Foreign Exch. Benchmark Rates Antitrust Litig.*, 74 F. Supp. 3d 581, 595 (S.D.N.Y. 2015) (quoting *Bhatia v. Piedrahita*, 756 F.3d 211, 218 (2d Cir. 2014) (other citations omitted)).  In evaluating constitutional standing, courts "must accept as true all material allegations of the complaint, and must construe the complaint in favor of the complaining party." *Warth v. Seldin*, 422 U.S. 490, 501 (1975).

The Fixing Banks argue that, because Plaintiffs fail to allege that they transacted at a specific time in the trading day when the impact of Defendants' alleged manipulation persisted, Plaintiffs "fail to allege that they ever 'engaged in a transaction *at a time* during which prices were artificial,'" and therefore have not asserted an injury-in-fact. Defs.' Mem. at 48 & n.21 (citing *In re LIBOR-Based Fin. Instruments Antitrust Litig.* (*LIBOR II*), 962 F. Supp. 2d 606, 622 (S.D.N.Y. 2013) (emphasis added)).[20]  Plaintiffs have, however, alleged that they sold Gold Investments on days when Defendants allegedly manipulated the Fix Price downward, *see* SAC App. B, and they further allege that Defendants' downward price manipulation had a lingering effect on gold prices, such that Plaintiffs were forced to sell gold at artificially depressed prices for some to-be-determined period of time after the Gold Fixing.  SAC ¶ 222 & chart.

While certain Plaintiffs may have actually benefitted from Defendants' alleged price manipulation (*e.g.*, they may have purchased gold at artificially suppressed prices and sold it when the price suppression had abated), that is not an issue that is ripe for resolution at the pleading stage.  *See, e.g.*, *In re Foreign Exch. Benchmark Rates Antitrust Litig.*, 74 F. Supp. 3d at 595 (finding an injury-in-fact where plaintiffs' alleged injuries stemmed from "having to pay supra-competitive prices as a result of [d]efendants' manipulation of the [f]ix," and dismissing defendants' demand for specifics as to the timing of certain transactions as inappropriate at the pleading stage); *see also Ross v. Bank of Am. N.A.*, 524 F.3d 217, 222 (2d Cir. 2008) ("The fact that an injury may be outweighed by other benefits, while often sufficient to defeat a claim for damages, does not negate standing.").  Because Plaintiffs have alleged a concrete injury as a result of Defendants' manipulation (*i.e.*, losses or artificially-reduced gains on their gold

---

[20]     While the Fixing Members do not address constitutional standing separately from antitrust standing, their arguments regarding Plaintiffs' alleged injuries are relevant to both inquiries.  The Court must consider both in evaluating subject matter jurisdiction at the pleading stage.  *Lance v. Coffman*, 549 U.S. 437, 439 (2007) ("Federal courts must determine that they have jurisdiction before proceeding to the merits.").

investments), they have constitutional standing.  *See Gelboim*, 823 F.3d at 770 (noting that the injury component of constitutional standing was "easily satisfied" by plaintiffs' allegation "that they were harmed by receiving lower returns on LIBOR-denominated instruments as a result of defendants' manipulation).

### III.      Plaintiffs Have Antitrust Standing

Section 4 of the Clayton Act establishes a private right of action to enforce Section 1 of the Sherman Act.  15 U.S.C. § 15.[21]  Applying the Supreme Court's decision in *AGC*, 459 U.S. at 519, the Second Circuit has held that "a private antitrust plaintiff [must] plausibly []allege (a) that it suffered a special kind of antitrust injury, and (b) that it is a suitable plaintiff to pursue the alleged antitrust violations and thus is an 'efficient enforcer' of the antitrust laws." *Gatt Commc'ns, Inc. v. PMC Assocs., L.L.C.*, 711 F.3d 68, 76 (2d Cir. 2013) (citations and internal quotations omitted).  "[A]ntitrust standing is a threshold, pleading-stage inquiry . . . ." *Id.* at 75-76 (quoting *NicSand, Inc. v. 3M Co.*, 507 F.3d 442, 450 (6th Cir. 2007) (en banc)).

### A.  Plaintiffs Have Adequately Alleged an Antitrust Injury

"'Congress did not intend the antitrust laws to provide a remedy in damages for all injuries that might conceivably be traced to an antitrust violation,'" *AGC*, 459 U.S. at 534 (quoting *Hawaii v. Standard Oil Co.,* 405 U.S. 251, 263 n.14 (1972)), but only for those injuries reflecting an "anticompetitive effect either of the violation or of anticompetitive acts made possible by the violation," *Gelboim*, 823 F.3d at 772 (quoting *Brunswick Corp. v. Pueblo Bowl–*

---

[21]       Section 4 of the Clayton provides:

> [A]ny person who shall be injured in his business or property by reason of anything forbidden in the antitrust laws may sue . . . in any district court of the United States in the district in which the defendant resides or is found or has an agent, without respect to the amount in controversy, and shall recover threefold the damages by him sustained, and the cost of suit, including a reasonable attorney's fee.

15 U.S.C. § 15(a).

*O–Mat, Inc.,* 429 U.S. 477, 489 (1977)).  "Competitors and consumers in the market where trade

is allegedly restrained are presumptively the proper plaintiffs to allege antitrust injury."  *In re*

*Aluminum Warehousing Antitrust Litig.*, No. 14-3574, 2016 WL 4191132, at *4 (2d Cir. Aug. 9,

2016) (quoting *Serpa Corp. v. McWane, Inc.*, 199 F.3d 6, 10 (1st Cir. 1999)).

      In *Gelboim*, the Second Circuit held that the manipulation of LIBOR rates by banks that

participated in the LIBOR benchmarking process gave rise to an antitrust injury on the part of

plaintiffs who transacted in LIBOR-dependent financial instruments.  823 F.3d at 772-75.  Even

though the defendants did not "control the market," and even though plaintiffs were free to

negotiate the interest rates attached to certain financial instruments, the Second Circuit found that

plaintiffs had adequately alleged that they were in a "worse position" as a consequence of the

defendant banks' horizontal price-fixing and, therefore, had plausibly alleged an antitrust injury.

*Id.* at 773-75 ("Even though the members of the price-fixing group were in no position to control

the market, to the extent that they raised, lowered, or stabilized prices they would be directly

interfering with the free play of market forces." (quoting *United States v. Socony–Vacuum Oil*

*Co.,* 310 U.S. 150, 221 (1940)) (other citation omitted)); *id.* at 776 (even if "LIBOR did not

necessarily correspond to the interest rate charged for any actual interbank loan[,] . . . [t]his is a

disputed factual issue that must be reserved for the proof stage." (internal citations and

quotations omitted)).

      Here, Plaintiffs allege that they were harmed by being forced to sell their Gold

Investments at artificially suppressed prices as a result of Defendants' manipulation of the PM

Fixing.  SAC ¶¶ 323-26.  Because Plaintiffs have alleged that their "loss[es] stem[] from a

competition-*reducing* aspect or effect of the [D]efendant's behavior," *Atl. Richfield Co. v. USA*

*Petroleum Co.*, 495 U.S. 328, 329 (1990) (emphasis in original), their alleged "injury is of the

type the antitrust laws were intended to prevent and that flows from that which makes [or might make] Defendants' acts unlawful." *Gatt*, 711 F.3d at 76 (citations and internal quotation marks omitted); *see also In re Foreign Exch. Benchmark Rates Antitrust Litig.*, 74 F. Supp. 3d at 596 (finding antitrust injury where defendants engaged in price-fixing as horizontal competitors, which caused plaintiffs to pay supra-competitive prices).[22]

In another recent decision, the Second Circuit clarified that, although as a general rule only participants in the defendant's market can claim an antitrust injury, plaintiffs in an affected secondary market may have antitrust standing if their alleged injuries are "'inextricably intertwined' with the injury the defendants ultimately sought to inflict" and if their injuries are "the essential means by which defendants' illegal conduct brings about its ultimate injury to the marketplace." *In re Aluminum Warehousing Antitrust Litig.*, 2016 WL 4191132, at *7 (2d Cir. Aug. 9, 2016); *see also Sanner v. Board of Trade of the City of Chicago*, 62 F.3d 918, 929 (7th Cir. 1995) ("[P]articipants in the cash market can be injured by anticompetitive acts committed in the futures market. . . . The futures market and the cash market for soybeans are thus 'so closely related' that the distinction between them is of no consequence to antitrust standing analysis."). *But see Atucha* v. *Commodity Exch., Inc.*, 608 F. Supp. 510, 516 (S.D.N.Y. 1985) (plaintiffs alleging that defendants' conspiracy to manipulate the price of COMEX silver futures caused the silver contracts plaintiff purchased on the London Metal Exchange to be inflated

---

[22]     In their Motion to Dismiss, the Fixing Banks originally argued that Plaintiffs failed to assert an antitrust injury because, even if accepted as true, Plaintiffs' alleged injuries would have resulted merely from Defendants' purported "misrepresentation[s]," not "from any anticompetitive aspect of defendants' conduct." Defs.' Mem. at 36 n.13 (quoting *LIBOR I*, 935 F. Supp. 2d at 688). That argument was squarely rejected by the Second Circuit, which held that the manipulation of LIBOR rates by the benchmarking banks constituted an anticompetitive practice that tended to "warp[] . . . market factors affecting the prices for LIBOR-based financial instruments." *Gelboim*, 823 F.3d at 776. The Fixing Banks have since withdrawn this argument based on *LIBOR I*. *See* Letter from Stephen Ehrenberg to the Court dated May 25, 2016, Dkt. 141 at 3.

artificially lacked standing despite plaintiff's allegations of an "inextricabl[e] connect[ion]" between futures markets in the United States and United Kingdom).

    While the Fixing Banks did not raise this theory in their Motion to Dismiss, in light of the Second Circuit's *In re Aluminum Warehousing* opinion, they now argue that Plaintiffs cannot assert an antitrust injury because they did not directly participate in the Gold Fixing, which the Fixing Banks define as the only "directly impacted" market.  *See* Letter from Joel S. Sanders to the Court, dated August 16, 2016, Dkt. 149 at 3 ("Even if the Afternoon London Gold Fixing was the means of an anticompetitive conspiracy, only plaintiffs who participated in the Fixing could have standing.").  Even assuming that the Fixing Banks' argument was properly asserted, the Fixing Banks fail to explain why the Fixing itself (which all parties acknowledge to be an artificially-constructed private "auction" that was instituted for the sole purpose of allowing the Fixing Banks to set a market-wide benchmark) should be considered the affected "market" for antitrust purposes.  While the guiding precedent leaves room for debate as to how the "market" should be defined under the unique circumstances of this case, the suggestion that the alleged conspirators are the only entities with standing to bring antitrust claims relating to the Gold Fixing seems absurd.

    Here, Plaintiffs allege that Defendants artificially depressed the price of gold for some period of time around the PM Fixing in order to profit from gold and gold futures trading at prices that were advantageous to them vis à vis Plaintiffs and other less-informed market participants.  These allegations are sufficient to demonstrate that Plaintiffs' injuries are "inextricably intertwined" with the Defendants' alleged manipulation of the Fix Price for antitrust standing purposes to the extent that Defendants relied on Plaintiffs' and other market

participants' trading on a manipulated Fix Price in order to carry out their alleged scheme.  The

Court therefore finds that Plaintiffs have adequately stated an antitrust injury.

### B.  Some Plaintiffs Have Established That They Are Efficient Enforcers

The Second Circuit has identified four factors to be considered in determining whether a

particular plaintiff has standing as an "efficient enforcer" to seek damages under the antitrust

laws:

> (1) whether the violation was a direct or remote cause of the injury; (2)
> whether there is an identifiable class of other persons whose self-interest
> would normally lead them to sue for the violation; (3) whether the injury was
> speculative; and (4) whether there is a risk that other plaintiffs would be
> entitled to recover duplicative damages or that damages would be difficult
> to apportion among possible victims of the antitrust injury. . . . Built into the
> analysis is an assessment of the "chain of causation" between the violation
> and the injury.

*Gelboim*, 823 F.3d at 772.  In other contexts the Supreme Court has noted that the first factor,

requiring proximate causation, "must be met in every case."  *Lexmark Int'l, Inc. v. Static Control*

*Components, Inc.*, __ U.S. __, 134 S. Ct. 1377, 1392 (2014).  In contrast, the third and fourth

factors are "problematic" and the "'potential difficulty in ascertaining and apportioning damages

is not . . . an *independent* basis for denying standing where it is adequately alleged that a

defendant's conduct has proximately injured an interest of the plaintiff's that the statute protects'

and other relief might be available."  *DNAML PTY, Ltd. v. Apple Inc.*, 25 F. Supp. 3d 422, 430

(S.D.N.Y. 2014) (quoting *Lexmark*, 134 S. Ct. at 1392 (emphasis in the original)).

### 1.  Plaintiffs Have Demonstrated a Sufficiently Direct Injury

Evaluating the directness of an injury is essentially a proximate cause analysis that hinges

upon "whether the harm alleged has a sufficiently close connection to the conduct the statute

prohibits."  *Lexmark*, 134 S. Ct. at 1390; *see also AGC*, 459 U.S. at 540-41 (evaluating

directness in light of the "chain of causation" between the asserted injury and the alleged

restraint of trade); *Lotes Co. v. Hon Hai Precision Indus. Co.*, 753 F.3d 395, 412 (2d Cir. 2014)

(considering, *inter alia*, whether the alleged injury was in the scope of the risk that defendant's

wrongful act created; was a natural or probable consequence of defendant's conduct; was the

result of a superseding or intervening cause; or "was anything more than an antecedent event

without which the harm would not have occurred") (quoting *CSX Transp., Inc. v. McBride*, 564

U.S. 685, 717 (2011) (Roberts, C.J., dissenting)).  "Where the chain of causation between the

asserted injury and the alleged restraint in the market 'contains several somewhat vaguely

defined links,' the claim is insufficient to provide antitrust standing."  *Laydon v. Mizuho Bank,

Ltd.*, No. 12-cv-3419(GBD), 2014 WL 1280464, at *9 (S.D.N.Y. Mar. 28, 2014) (citing *AGC*,

459 U.S. at 540).

     As an appendix to the SAC, Plaintiffs have provided a list of the dates and sales prices for

Gold Investments that Plaintiffs sold on days when Defendants are alleged to have manipulated

the PM Fixing.  SAC App. B.  Plaintiffs do not state the quantities, types of investments,

counterparties or times at which they sold their Gold Investments, but instead allege that

Defendants' suppression of the Fix Price "directly affect[ed] the price of physical gold, gold

futures, and Gold ETF shares, and other Gold Investments," SAC ¶ 115, causing Plaintiffs to

"receive[] lower sales prices than they would have received in a competitive market free of

[manipulation]," *id.* ¶ 324.  With respect to physical gold, Plaintiffs allege that they sold gold at

"artificial prices proximately caused by Defendants' unlawful manipulation," *see, e.g.*, SAC ¶

29, but do not clearly define the relationship between the Fix Price (which is only set twice a

day), spot pricing, which fluctuates throughout the trading day, and the exact prices at which

Plaintiffs sold gold during the Class Period.  *See* SAC App. B.  Similarly, with respect to gold

futures, options and ETFs, Plaintiffs claim that the value of their investments was directly

affected by the Fix Price, *id.* ¶¶ 108-10, 113, 309, but do not specify how pricing of their respective investments varied (or did not) around the Fix Price at different times during the trading day.

The Fixing Banks rely on several lines of cases to argue that, regardless of whether Plaintiffs sold physical gold or gold derivatives, their claims are too indirect and remote to confer antitrust standing.  First, the Fixing Banks argue that Plaintiffs lack standing because they do not allege that they transacted directly with Defendants and "only direct purchasers of [the] monopolized product[]" have antitrust standing, and Plaintiffs did not transact directly (or indirectly) with the Defendants.  Defs.' Mem. at 32-33 (quoting *In re Pub. Offering Antitrust Litig.*, No. 98-7890 (LMM), 2004 WL 350696, at *5 (S.D.N.Y. Feb. 25, 2004)).  In making this argument, the Fixing Banks rely on *Ill. Brick Co. v. Illinois*, in which the Supreme Court held that indirect purchasers lacked standing to recover damages for overcharges resulting from antitrust violations that were passed on through a distribution chain.  431 U.S. 720, 729 (1977).

The Court's reasoning in *Illinois Brick* was predicated on its concern that permitting indirect purchasers to sue for antitrust violations "would create a serious risk of multiple liability for defendants," *id.* at 730, and the notion that the antitrust laws would be more "effectively enforced by concentrating the full recovery for the overcharge in the direct purchasers," *id.* at 735.  As a result, downstream purchasers in a distribution chain typically lack antitrust standing. *See, e.g.*, *Kansas v. UtiliCorp United, Inc.,* 497 U.S. 199 (1990) (public utilities but not residential customers to whom they sell gas have standing to sue natural gas companies for antitrust injuries); *In re Beef Indus. Antitrust Litig.,* 710 F.2d 216 (5th Cir. 1983) (packers who sell to retail grocers have standing to sue grocers alleged to have conspired to set wholesale beef prices at artificially depressed levels, but feeders who sell to packers may not).

This argument, however, mischaracterizes Plaintiffs' claims.  Plaintiffs do not allege that Defendants suppressed the price of a particular bar of gold that was later sold through a distribution chain to Plaintiffs but rather that Defendants suppressed the Fix Price, which had a direct (and negative) impact on the value of their Gold Investments.  SAC ¶¶ 105-115.  In addition, the Fixing Banks overreach in suggesting that *Illinois Brick* has been interpreted to deny standing to every plaintiff who is not in direct privity with the defendant.  Defs.' Mem. at 32-33.  Indeed, since *Illinois Brick* was decided, courts have found that differently-situated plaintiffs may have standing to assert antitrust injuries, provided that each plaintiff suffered a unique and sufficiently direct injury as a result of defendants' anticompetitive conduct.  *See, e.g.*, *Blue Shield of Va. v. McCready,* 457 U.S. 465 (1982) (employee who received health coverage under a group plan purchased by her employer had antitrust standing even though she was not a competitor of, or in direct privity with, defendants because her injury was "inextricably intertwined with the injury the conspirators sought to inflict"); *In re Aluminum Warehousing Antitrust Litig.*, 2016 WL 4191132, at *7 (an antitrust defendant may "corrupt a separate market in order to achieve its illegal ends, in which case the injury suffered can be said to be 'inextricably intertwined' with the injury of the ultimate target"); *Loeb Indus., Inc. v. Sumitomo Corp.*, 306 F.3d 469, 481 (7th Cir. 2002) (certain copper purchasers had antitrust standing to bring claims against defendants who conspired to manipulate the price of copper futures, even though plaintiffs never dealt directly with the defendants because "different injuries in distinct markets may be inflicted by a single antitrust conspiracy").

Next, the Fixing Banks argue that Plaintiffs' alleged injuries are raised under a so-called "umbrella theory" of liability, which has not been well-received by at least some courts in this Circuit.  Defs.' Mem. at 33-34 (citing cases).  "Umbrella standing concerns are most often

evident when a cartel controls only part of a market, but a consumer who dealt with a non-cartel member alleges that he sustained injury by virtue of the cartel's raising of prices in the market as a whole." *Gelboim*, 823 F.3d at 778.  As noted in *Gelboim*, the viability of the umbrella liability theory has not been resolved in this Circuit.  *Id.* at 778-79.  Due to the uncertainty surrounding the viability of the theory umbrella liability, and the unique facts of this case, analyzing Plaintiffs' claims under an umbrella theory of liability leads to no dispositive conclusions.

In the typical umbrella liability case, plaintiffs' injuries arise from transactions with  non-conspiring retailers who are able, but not required, to charge supra-competitive prices as the result of defendants' conspiracy to create a pricing "umbrella."  *See, e.g.*, *Gross v. New Balance Athletic Shoe, Inc.*, 955 F. Supp. 242, 245-47 (S.D.N.Y. 1977) (rejecting umbrella theory of liability and noting that "the causal connection between the alleged injury and the conspiracy is attenuated by significant intervening causative factors," most notably, the "independent pricing decisions of non-conspiring retailers").  Here, in contrast, Plaintiffs allege that Defendants rigged the "entire . . . market" for gold investments and that all market participants "moved in line" according to Defendants' price manipulation, leaving little room for any interfering price impact due to the actions of non-culpable entities or exogenous market forces.  Pls.' Opp. at 32-33.  In other words, Defendants are not merely alleged to have conspired to alter prices within a particular segment or region of the market but rather are alleged to have manipulated the benchmark price, which all market participants (buyers and sellers alike) relied upon in trading gold investments across a variety of market fora.

As the Second Circuit made clear in *Gelboim*, under such circumstances, there appears to be little, if any, difference between the injuries suffered by market participants who sold gold to one of the Defendants (the alleged cartel members) and those who sold to non-conspiring third-

parties. *Gelboim*, 823 F.3d at 779. Accepting as true Plaintiffs' allegations that Defendants'

suppression of the Fix Price had a direct impact on market participants who sold gold on days

when the PM Fixing was manipulated (regardless of the counterparty), the Court finds that at

least some subset of Plaintiffs have sufficiently alleged proximate causation for purposes of

antitrust standing. That said, there appear to be substantial challenges to Plaintiffs' causation

theory: the Court is extremely skeptical that *all* market participants who sold gold or gold

instruments on alleged manipulation days will ultimately be able to move forward with their

claims. *See id.* ("Requiring the Banks to pay treble damages to every plaintiff who ended up on

the wrong side of a[] [relevant transaction] would, if appellants' allegations were proved at trial,

not only bankrupt [some] of the world's most important financial institutions, but also vastly

extend the potential scope of antitrust liability in myriad markets where derivative instruments

have proliferated."). Although causation and standing are threshold issues to be decided at the

pleading stage, because the record is not (and could not reasonably be) sufficiently developed

with respect to Plaintiffs' claim that the effect of Defendants' alleged manipulation persisted

throughout the trading day and into future days, SAC ¶¶ 222 & chart, 326, the Court finds that

these questions must be deferred to the class certification stage.

### 2. Some Plaintiffs Are Sufficiently Direct and Interested Victims for Purposes of Enforcing the Antitrust Laws

As alluded to, *supra*, the Court is convinced that at least some subset of Plaintiffs has

suffered a sufficiently direct injury and therefore is sufficiently interested to litigate the antitrust

claims at issue. The most direct victims of Defendants' alleged manipulation would presumably

be sellers who transacted at the Fix Price or at a price that incorporated the Fix Price as a

component and sellers who transacted within a circumscribed time period around the Gold

Fixing (before the impact of Defendants' alleged manipulation had been diluted by extraneous

market factors).[23]  While it is unclear how many market participants transacted "at" the Fix Price

on "manipulation days," versus how many Plaintiffs transacted in close temporal proximity to

the Fixing window, the potential existence of more direct plaintiffs does not necessarily defeat

Plaintiffs' standing to the extent that Plaintiffs suffered separate, and sufficiently direct, injuries.

*In re DDAVP Direct Purchaser Antitrust Litig.*, 585 F.3d 677, 689 (2d Cir. 2009) ("Inferiority to

other potential plaintiffs can be relevant, but it is not dispositive." (internal quotations and

citation omitted)); *Ice Cream Liquidation, Inc. v. Land O'Lakes, Inc.*, 253 F. Supp. 2d 262, 274

(D. Conn. 2003) ("[T]he antitrust laws do not limit standing to only that class of purchasers with

the most direct injury."); *cf. DNAML*, 25 F. Supp. 3d at 431 ("A retailer's lost profits are wholly

distinct from consumer overcharges, and to "[d]eny[ ] the plaintiff[ ] a remedy in favor of a suit

by [consumers] would thus be likely to leave a significant antitrust violation . . . unremedied."

(alterations in the original) (citations omitted)).  This is particularly true where, as here, a rigid

rule requiring Plaintiffs to have transacted "at" the Fix Price would effectively eliminate private

enforcement with respect to all claims brought by futures sellers, who dominate the market and

who transact via an exchange rather than OTC or through contracts tied to the Fix Price.  The

Court therefore finds that at least some group of Plaintiffs are sufficiently interested so as to be

appropriate antitrust enforcers.

---

[23]    Plaintiffs' failure to allege that the Fix Price was the price (or an established component of the price) at
which they transacted distinguishes this case from many of Plaintiffs' cited authorities.  *See Loeb Indus., Inc*, 306
F.3d at 476, 494-95 (finding antitrust standing for certain copper purchasers alleging conspiracy to inflate copper
futures prices where plaintiffs transacted at prices based on "rigid formulas" related to copper futures); *In re
Aluminum Warehousing Antitrust Litig.*, 95 F. Supp. 3d 419, 429-30, 444 (S.D.N.Y. 2015), *motion to certify appeal
denied*, No. 13-md-2481(KBF), 2015 WL 4646822 (S.D.N.Y. May 14, 2015) (finding antitrust standing for
plaintiffs who alleged that defendants conspired to raise the "Midwest Premium" price, which was a component of
plaintiffs' aluminum contracts).

### 3. Except with Respect to Claims Arising out of ETF Sales, Standing Is Not Defeated By the Risks of Speculative Injuries, Duplicative Damages, or Difficulties in Apportioning Damages

Standing may be lacking where courts would otherwise be required to engage in "hopeless speculation concerning the relative effect of an alleged conspiracy in the [relevant markets] . . . , where countless other market variables could have intervened to affect [] pricing decisions." *Reading Indus., Inc. v. Kennecott Copper Corp.*, 631 F.2d 10, 13-14 (2d Cir. 1980). For the reasons stated, *supra*, the Court is concerned that at least some Plaintiffs' alleged injuries are highly speculative. Because the PM Fixing occurs only once a day, while gold instruments can be sold OTC twenty-four hours a day and via exchanges that have varying hours of operation all around the world, Plaintiffs cannot deny that other market variables may have affected gold prices before and after the PM Fixing. (Indeed, were it otherwise, pricing across gold markets would essentially be flat, varying only twice a day). And, while Plaintiffs allege that Defendants' price suppression lingered long after the end of the Fixing call, a significant evidentiary record will need to be developed before the Court can determine what role any such lingering suppression played in the losses suffered by Plaintiffs at various points throughout the trading day in the different markets in which they traded. Nevertheless, Plaintiffs' allegations regarding the frequency and relative intensity of downward price swings that occurred only at the PM Fixing time (but not on weekends and holidays when the Fixing Banks did not meet), SAC ¶¶ 191-93 & chart, are sufficient to permit an inference, at the pleading stage, that the PM Fixing was an event that altered pricing in the various markets in which Plaintiffs transacted.

Because the Court finds that the PM Fixing was a price altering event, because exogenous factors affect price movements in most antitrust cases, and because the existence of such factors does not alone defeat standing, questions regarding the extent of Plaintiffs' injuries

can best be resolved at a later stage.  *See Grosser v. Commodity Exch., Inc.*, 639 F. Supp. 1293,

1319-20 (S.D.N.Y. 1986) (rejecting presence of extraneous factors affecting price movement as a

reason to deny standing); *Strax v. Commodity Exch., Inc.*, 524 F. Supp. 936, 940 (S.D.N.Y.

1981) ("[W]hile—as is true with the vast majority of antitrust cases—proof of damages will most

likely not be simple, this is not an action 'based on conjectural theories of injury and attenuated

economic causality that would mire the courts in intricate efforts to recreate the possible

permutations in the causes and effects of a price change.'" (quoting *Reading*, 631 F.2d at 14)).

Finally, with respect to damages, the Court finds that here, as in the *LIBOR* cases, "it is

difficult to see how [Plaintiffs] would arrive at [a "just and reasonable estimate of damages"],

even with the aid of expert testimony.  *Gelboim*, 823 F.3d at 779 (citation and internal quotation

marks omitted).  Nonetheless, because "some degree of uncertainty stems from the nature of

antitrust law," *id.*, and because the "potential difficulty in ascertaining and apportioning damages

is not . . . an *independent* basis for denying standing where it is adequately alleged that a

defendant's conduct has proximately injured an interest of the plaintiff's that the statute

protects," *Lexmark*, 134 S. Ct. at 1392 (emphasis in original), the Court finds that standing has

been adequately pled.  In addition, given that, here, Plaintiffs have alleged separate injuries

(rather than derivative or duplicative injuries) and inasmuch as DOJ's Antitrust Division has

closed its investigation and no governmental entities have imposed penalties or fines against the

Defendants relating to the alleged conspiracy, any concerns regarding duplication and

apportionment appear to be hypothetical or minimal.  The Court therefore finds that, although it

harbors grave doubts regarding the scope of Plaintiffs' proposed class, Plaintiffs have plausibly

alleged that they are efficient enforcers for purposes of antitrust standing.

**4. Plaintiffs Are Not Efficient Enforcers and Therefore Lack Antitrust Standing with Respect to Their Sales of ETF Shares**

Defendants argue that Plaintiffs whose injuries arise solely from sales of gold ETF shares are differently situated because their alleged injuries are derivative and duplicative of the injuries suffered by the ETF fund itself. Defs.' Mem. at 36. Plaintiffs counter that this issue is not ripe for disposition at the pleading stage because ETF funds primarily "buy and hold gold," so that shareholders, such as Plaintiffs, who routinely sell their ETF shares, are better positioned than the funds to enforce the antitrust claims at issue. Pls.' Opp. at 35-36. Plaintiffs acknowledge, however, that some ETF funds did sell gold during latter portions of the Class Period, and that, to the extent those funds wished to assert antitrust claims relating to Defendants' alleged manipulation of the PM Fixing, Plaintiffs' claims would be duplicative. Tr. at 129:13-130:11.

The Court therefore agrees with Defendants. Because Plaintiffs' injuries are derivative of a primary injury suffered by the ETF fund, the Court finds that the ETF funds are the more direct victims, and that permitting Plaintiffs to proceed independently with respect to their ETF claims would create a real risk of duplicate recovery. The Fixing Banks' Motion to Dismiss is therefore granted with respect to Plaintiffs' antitrust claims arising from sales of ETF shares, and Plaintiffs' antitrust claims are dismissed to the extent they are predicated on sales of gold ETF shares.

**IV.    Plaintiffs Adequately Allege an Unlawful Agreement to Fix Prices and Restrain Trade from January 1, 2006 through December 31, 2012**

Plaintiffs bring claims for conspiracy in restraint of trade under Section 1 of the Sherman Act. "Because § 1 of the Sherman Act does not prohibit [all] unreasonable restraints of trade . . . but only restraints effected by a contract, combination, or conspiracy, . . . [t]he crucial question is whether the challenged anticompetitive conduct stem[s] from independent decision or from an

agreement, tacit or express." *Twombly*, 550 U.S. at 553 (internal quotations and citations omitted) (alterations in the original).

To allege an unlawful agreement, Plaintiffs must assert either direct evidence (such as a recorded phone call or email in which competitors agreed to fix prices) or "circumstantial facts supporting the *inference* that a conspiracy existed." *Mayor & City Council of Baltimore* (*City of Baltimore*) *v. Citigroup, Inc.*, 709 F.3d 129, 136 (2d Cir. 2013) (emphasis in original); *see also Gelboim*, 823 F.3d at 781 ("At the pleading stage, a complaint claiming conspiracy, to be plausible, must plead 'enough factual matter (taken as true) to suggest that an agreement was made . . . .'" (quoting *Anderson News L.L.C. v. Am. Media, Inc.*, 680 F.3d 162, 184 (2d Cir. 2012)). Because conspiracies "nearly always must be proven through inferences that may fairly be drawn from the behavior of the alleged conspirators," the Court cannot take Plaintiffs' failure to present direct evidence as a sign that no conspiracy existed. *In re Foreign Exch. Benchmark Rates Antitrust Litig.*, 74 F. Supp. 3d at 591 (quoting *Anderson News*, 680 F.3d at 183). At the pleading stage, Plaintiffs "need not show that [their] allegations suggesting an agreement are more likely than not true or that they rule out the possibility of independent action . . . ." *Gelboim v. Bank of Am. Corp.*, 823 F.3d at 781 (quoting *Anderson News*, 680 F.3d at 184). Instead, "'a well-pleaded complaint may proceed even if . . . actual proof of those facts is improbable, and . . . a recovery is very remote and unlikely' as long as the complaint presents *a* plausible interpretation of wrongdoing." *In re Foreign Exch. Benchmark Rates Antitrust Litig.*, 74 F. Supp. 3d at 591 (quoting *Twombly*, 550 U.S. at 556) (emphasis in *In re Foreign Exch. Benchmark Rates Antitrust Litig.*)).

Here, Plaintiffs clear the plausibility standard, albeit barely, with respect to their claim of conspiracy in restraint of trade based on allegations that the Fixing Banks conspired to suppress the Fix Price from January 1, 2006 through December 31, 2012.[24]

### A.  Plaintiffs' Allegations of Parallel Conduct

Plaintiffs allege that Defendants engaged in parallel conduct by offering spot quotes around the PM Fixing that were clustered at prices that were lower than those of other market participants.  In particular, Plaintiffs analyzed approximately 846,000 spot quotes for gold (approximately 300,000 of which were from Defendants) in the 45-minute window surrounding the PM Fixing and found that Defendants' quotes had a significantly lower coefficient of variation than those in the market at large.  SAC ¶¶ 250-54 & chart.  Defendants' quotes were also significantly lower than the rest of the market on days when the Fix Price marked a downward shift in the prevailing spot price.  *Id.* ¶¶ 256-57 & chart ("This "underpricing" as compared to the rest of the market was observed to be *five times less* than what was observed on days when the Fix did not spike downward.").  Plaintiffs further highlight approximately 12 days on which two or more Defendants appear to have offered spot quotes that correlated with a downward trend in gold prices shortly before and after the publication of the PM Fix Price.  *See id.* 261-66 & charts, 267; App. I.

The Fixing Banks correctly argue that this pattern of conduct is, without more, of limited persuasive value.  While Plaintiffs show that Defendants quoted lower prices (and similar prices) around the PM Fixing on days on which the gold price dropped, Plaintiffs acknowledge that

---

[24]      Because most of Plaintiffs' compelling facts, including those based on statistical analyses, are drawn from 2006 through 2012, Plaintiffs do not plausibly plead the existence of an antitrust conspiracy prior to 2006 or after 2012.  *See, e.g.*, SAC ¶¶ 152-53 & charts, 154 & charts, 156 & chart, 222 & chart; *see also* App. D (while a drop in intraday gold prices is seen in 2004, the pattern dissipates in 2005 and then returns in 2006-2012), App. E (no data provided for 2013); App. G (pattern seen for 2006-2012; no data provided for 2013); App. H (data available for May 2009 through February 2013).

other non-Defendant market participants (including Credit Suisse and others) offered similar

quotes, and when averaged together with Defendants' quotes on days on which the Fix Price

moved upwards, Defendants' quotes were only .007% lower than the prevailing market average.

*Id.* ¶ 263.  In addition, Plaintiffs acknowledge that their sample of quotes was necessarily limited

by the lack of publicly available pricing information.  *Id.* ¶ 250.  Because of the limited probative

value of such allegations, courts have long observed that a mere showing of parallel conduct or

interdependence, which may be "consistent with conspiracy, but [is] just as much in line with a

wide swath of rational and competitive business strategy unilaterally prompted by common

perceptions of the market" is insufficient to state an antitrust claim.  *Twombly*, 550 U.S. at 545;

*see also In re Elevator Antitrust Litig.*, 502 F.3d 47, 51 (2d Cir. 2007) ("[s]imilar pricing can

suggest competition at least as plausibly as it can suggest anticompetitive conspiracy").

### B.  Plaintiffs' Allegations of Plus Factors

A conspiracy may, however, be "inferred on the basis of conscious parallelism, when such

interdependent conduct is accompanied by circumstantial evidence and plus factors."  *City of*

*Baltimore*, 709 F.3d at 136 (citations omitted); *see also Twombly*, 550 U.S. at 557 (allegations of

parallel conduct "must be placed in a context that raises a suggestion of a preceding agreement").

Such "'plus factors may include: a common motive to conspire, evidence that shows that the

parallel acts were against the apparent individual economic self-interest of the alleged

conspirators, and evidence of a high level of interfirm communications."  *City of Baltimore*, 709

F.3d at 136 (quoting *Twombly,* 425 F.3d 99, 114 (2d Cir. 2005), *rev'd on other grounds,*

*Twombly,* 550 U.S. 544)).  "These factors are neither exhaustive nor exclusive, but rather

illustrative of the type of circumstances which, when combined with parallel behavior," may

permit the inference of "the existence of an agreement."  *City of Baltimore*, 709 F.3d at 136 n.6.

Here, Plaintiffs argue that there are several types of circumstantial evidence and plus factors from which a conspiracy to restrain trade may be plausibly inferred.  Pls.' Opp. at 15-28. While several of Plaintiffs' asserted plus factors are unavailing (and, taken individually, none is particularly strong), when viewed as a whole, Plaintiffs' allegations are sufficient—again, just barely—to nudge Plaintiffs' claims over the line from the realm of the possible to the realm of the plausible.

As a threshold matter, Plaintiffs' allegations that the structure of the Gold Fixing itself, including the fact that the auction occurred via private telephone call, do not constitute a "plus factor."  Pls.' Opp. at 15-16.  In so finding, the Court notes that this case is different from many (and maybe even most) antitrust conspiracy cases in which the defendant's misconduct and supporting communications occur in secret, outside the public eye.  Here, in contrast, Defendants' alleged misconduct occurred primarily through a twice daily Fixing call, which, although private, had been acknowledged and accepted by market participants as a legitimate and beneficial pricing exercise for nearly one hundred years.  The structure of the Fixing is not irrelevant because it provided a forum and opportunity for the Fixing Banks to conspire, but the "opportunity to collude does not translate into collusion."  *Ross v. Am. Exp. Co.*, 35 F. Supp. 3d 407, 452 (S.D.N.Y. 2014) (citation omitted); *see also Venture Tech., Inc. v. Nat'l Fuel Gas Co.,* 685 F.2d 41, 47 (2d Cir. 1982) (noting an antitrust plaintiff must show "more than the existence of a climate in which such a conspiracy may have been formed").  The Court therefore finds that, even at the pleading stage, the structure of the Gold Fixing does not, without more, constitute a "plus factor" in support of Plaintiffs' claims.  *Cf. In re Publ'n Paper Antitrust Litig.*, 690 F.3d 51, 65 (2d Cir. 2012) ("private phone calls and meetings—for which no social or personal purpose has been persuasively identified" suggested conspiratorial communications).

36

The Court also disagrees with Plaintiffs' suggestion that the ongoing government investigations into possible manipulation of precious metals benchmarks and findings of misconduct with respect to the FX and LIBOR benchmarks constitute circumstantial evidence of a conspiracy in the gold market.  Pls.' Opp. at 23-25.  Even if the Court accepts these allegations (which Defendants argue should be stricken as irrelevant, Defs.' Mem. at 22-23, UBS Mem. at 6-7), evidence of Defendants' wrongdoing with respect to LIBOR and FX and the existence of regulatory investigations into the precious metals markets do not substantiate Plaintiffs' antitrust claims with respect to the Gold Fixing.  While not irrelevant, the fact that UBS has traded precious metals from its FX desks since the end of 2008, SAC ¶ 241, and was sanctioned by FINMA for misconduct associated with its FX and precious metals trading, *id*. ¶¶ 301-03, does not constitute evidence that UBS (or the Fixing Banks) conspired to use the same techniques employed in the FX benchmarking scheme in the Gold Fixing.  *See, e.g., In re Elevator Antitrust Litig*., 502 F.3d at 52 (rejecting argument that "if it happened there, it could have happened here").

Moreover, Plaintiffs' efforts to infer wrongdoing from Defendants' misconduct in the FX context is significantly hampered by the fact that plaintiffs in those cases cited to direct evidence of manipulation and government findings of collusion, whereas no similar allegations are present here.  This is so notwithstanding the fact that government investigations into the Gold Fixing have been going on for well over two years, and that Plaintiffs have alleged that Defendants were not just colluding on the private Fixing calls but also in chat rooms and via other forms of electronic communication throughout the trading day.  Significantly, none of the regulatory investigations cited by Plaintiffs has advanced to the point of charging any of the Defendants with colluding to manipulate the price of gold, and DOJ's Antitrust Division has closed its

investigation without charging anyone.  Tr. at 15:6-16:2.  The Court finds, therefore, that the mere fact that regulatory entities have investigated, and may still be investigating, the possibility of misconduct with respect to the Gold Fixing is not a "plus factor."

Nevertheless, Plaintiffs adequately allege other circumstantial evidence and "plus factors" that, taken together, render their antitrust claims plausible.[25]  For example, while the structure of the Fixing is not particularly damning in itself, the co-occurrence of the PM Fixing at the same time as Defendants' alleged price manipulation constitutes circumstantial evidence of an agreement to restrain trade.  In particular, the Court finds significant Plaintiffs' allegations that, as a group, Defendants were apparently pushing gold prices down in the spot market around the same time that they were sharing order information via the PM Fixing call on days when the PM Fixing ultimately resulted in a significant downward price swing.  These allegations, buttressed by the fact that Defendants were disproportionately responsible for quoting "the single biggest drop" from the prior quote observed in Plaintiffs' data set, SAC ¶ 258, constitute circumstantial evidence not just that the Fixing Banks were trading in parallel but that they were causing downward price movement around the PM Fixing.

In addition, Plaintiffs have sufficiently alleged that the Fixing Banks had a "common motive" collectively to manipulate the Fix Price.  *City of Baltimore*, 709 F.3d at 136.  A "[m]otive to conspire may be inferred where the parallel 'action taken [by defendants] had the effect of creating a likelihood of increased profits.'"  *Anderson News, L.L.C. v. Am. Media, Inc.*, 123 F. Supp. 3d 478, 500 (S.D.N.Y. 2015) (quoting *First Nat'l Bank of Ariz. v. Cities Serv. Co.*, 391 U.S. 253, 287 (1968) (alterations in *Anderson News*)); *cf. Ross*, 35 F. Supp. 3d at 442 (citation omitted) (courts may not "infer a conspiracy where the defendants have no 'rational

---

[25]    It should be noted that the complaint in this case is weaker than the complaint in the similar case involving the Silver Fix.  *See In re London Silver Fixing, Ltd., Antitrust Litig.*, No. 14-md-2573 (VEC).

economic motive to conspire, and if their conduct is consistent with other, equally plausible explanations.'").

Plaintiffs argue that Defendants were incentivized artificially to suppress the Fix Price because (1) they held net short gold futures positions on COMEX, which allowed them to profit when the price of gold fell and (2) Defendants' foreknowledge of downward price swings enabled them to profit from a variety of Fix Price-dependent gold-related investments. While Plaintiffs' "net short" theory fails the plausibility test, their argument that the Fixing Banks were incentivized to profit from their foreknowledge of the Fix Price constitutes a "common motive" for antitrust purposes.

As an initial matter, Plaintiffs' theory regarding Defendants' short futures positions is improperly predicated on "aggregate" CFTC data showing that, as a whole, large bullion banks reporting more than 200 calls, puts, and futures contracts were "net short" on gold futures and options throughout the Class Period.[26] SAC ¶¶ 211-12 & chart. Accepting Plaintiffs' assertion that Defendants were included in the CFTC's aggregate data, the data does not plausibly support an allegation that any particular bank was net short at any particular time (let alone that all of the Defendants were net short throughout the alleged conspiratorial period). Moreover, Plaintiffs' data is limited to COMEX positions, whereas Defendants are also alleged to have maintained large physical positions and traded gold derivatives in markets (other than COMEX) around the world. Accordingly, the Court cannot determine what positions the Defendants held or even whether they were, in fact, long or short at any particular point during the Class Period.[27]

---

[26]   Based on the parties' presentations at oral argument, this data reflects the combined positions of approximately 20 non-U.S. banks. Tr. at 10:4-21, 65:24-67:12.

[27]   The CFTC data further appears to suggest that non-U.S. banks, ostensibly including the Defendants, were not "net short" for certain periods of time from 2008 to 2009. SAC ¶ 213 & chart.

Even if the Court were to accept Plaintiffs' claim that the Defendants (as opposed to other bullion banks) consistently held large net short positions in gold futures throughout the Class Period, Plaintiffs fail to present a plausible theory as to how Defendants profited from their short positions during a bull market in which the price of gold nearly quadrupled. SAC ¶ 110 & chart. The holder of a short position only profits if the price of gold falls, in which case the holder can eliminate its delivery obligation before expiry by purchasing a lower-priced offsetting futures contract and pocketing the difference in price. SAC ¶¶ 100, 104; *see also Strobl v. N.Y. Mercantile Exch.*, 768 F.2d 22, 24 (2d Cir. 1985) ("The difference in price between the original contract and the offsetting contract determines the amount of money made or lost."). Conversely, in a rising market, short futures are a losing proposition. Because the market price of gold rose steadily throughout the Class Period, Defendants would have had to hold massive long positions in physical gold, derivatives, and over-the-counter investments in order to counter losses on any short positions, including short futures. Thus to the extent there were discrete periods when the price of gold fell, enabling Defendants to reap profits from their short futures, those profits would have been neutralized by Defendants other long holdings, thus negating Plaintiffs' alleged profit motive.[28]

Plaintiffs' counterargument is that, even if Defendants' short futures positions were effectively "hedged" by other long positions in gold, Defendants still stood to profit from the artificial suppression of gold prices because, unlike investments in physical gold and gold forwards, gold futures are marked-to-market daily, "requiring daily cash margin payments by the side the market has moved 'against' as of a particular time of day." Pls.' Opp. at 21 (citing SAC

---

[28]    Plaintiffs take issue with Defendants' suggestion that their short positions were hedged. Pls.' Opp. at 20-21. But Plaintiffs' theory fares no better without the presumption that Defendants generally held balanced portfolios. Without offsetting "hedged" positions, Defendants would have suffered staggering losses (not gains) on their alleged "massive" short holdings as the price of gold steadily rose throughout the Class Period.

¶¶ 217-21).  Thus, Defendants could have profited from short-term cash flows resulting from intra-day downward price movements, while simultaneously benefiting from increases in the value of physical gold or forwards that they held for investment over the long-term.  SAC. ¶¶ 218-21 & chart.  But this theory, too, defies logic.  Unless the market moved downward more often than it increased, Defendants, as holders of net short futures positions, would have been required to pay margin, rather than receiving margin payments.  Plaintiffs' own hypotheticals acknowledge that, in a rising market where gold prices nearly quadrupled from 2004 to 2012, it would be reasonable to assume that the overall market would increase on more days than it decreased (for example, the market might increase on 60% of the trading days and decrease on 40% of the days).  *Id.* ¶ 126.  Thus, the Court cannot logically accept that Defendants would have profited from cash-margin payments when those payments would have worked against them on the majority of trading days.  As a result, even if the Court accepts Plaintiffs' allegations (1) that the effects of Defendants' price suppression lingered until COMEX futures settled at the end of the trading day, SAC ¶ 222 (such that Defendants profited from cash-margin payments on days on which the price of gold was artificially suppressed), and (2) that Defendants could have earned more than a trivial amount of interest on such cash margin payments, Pls.' Opp. at 21, Defendants would still have lost money on their short futures holdings overall.[29]  The Court therefore finds Plaintiffs' "net short" theory to be implausible.

On the other hand, Plaintiffs' theory of motive based on the Fixing Banks' foreknowledge of the Fix Price is marginally persuasive.  SAC ¶¶ 228-33.  As financial institutions with large

---

[29]      Plaintiffs' rebuttal that "even if shorts were not generating such cash flows because prices were overall going up, suppressing the price would still create a daily, cash-benefit for the Defendant Banks because they would lose less cash to margin payments than they otherwise would have" is unconvincing.  *Id.* ¶ 221 n.42; Pls.' Opp. at 21 n.32.  "Losing less" is simply not a plausible "common motive" to support Plaintiffs' antitrust claims, even with respect to Defendants' hypothetical rogue traders who may have sought to "maximize the returns (or limit the losses) of futures short positions," regardless of the Defendants' other investments and holdings.  SAC ¶ 224.

presences in the gold market, the Fixing Banks all had an interest in the outcome of the Gold

Fixing.  For example, Plaintiffs argue that, because the Fixing Banks were able predictably to

cause gold prices to rise or fall at the Gold Fixing, they could strategically buy low and sell high

in ways that other non-Fixing market participants could not.  *Id.* ¶¶ 219, 230.  The Fixing Banks

could also use their collective influence over the Fixing to profit from gold derivatives whose

payments were expressly tied to the Fix Price, *id.* ¶ 231, and from "digital options" and other

instruments that could be triggered (or not) when the price of gold crossed a specified price

threshold, *id.* ¶ 232.  While, as stated *supra*, the Court does not find the existence of

governmental investigations into the gold market to be persuasive as a general matter, for

purposes of pleading antitrust motive, the Court does find certain regulatory findings to be

relevant.  In particular, Plaintiffs' allegations that Barclays was fined for failing to "adequately

monitor . . . whether [its] traders may have been placing orders to affect inappropriately the price

of gold in the Gold Fixing," *id.* ¶ 284, based on findings that a Barclays trader had, in at least one

instance, successfully manipulated the Fix Price in order to save the bank money provide some

support for the notion that the Fixing Banks could (and at least Barclays did) manipulate the Fix

Price in order to benefit their own financial interests, *id.* ¶¶ 284-88.  Although Plaintiffs' theory

is admittedly generalized (in the sense that it applies with equal cogency to a scheme based on

upward manipulation as well as it does to downward price manipulation), prior investigations

have shown that Defendants found ways to manipulate other benchmarks in ways that were not

initially apparent to outsiders.  *See, e.g.*, *Alaska Elec. Pension Fund v. Bank of Am. Corp.*, No.

14-cv-7126 (JMF), 2016 WL 1241533, at *5 (S.D.N.Y. Mar. 28, 2016) (finding common motive

based on allegations that defendants were "major players in the market for interest rate

derivatives who were jointly motivated by a desire to maximize profits by manipulating the

42

ISDAfix benchmark rates" based, in part, on findings from the LIBOR and FX investigations that "rate manipulation can be economically sensible and feasible" even if defendants' economic positions were not aligned throughout the class period).

Another factor that the Court considers as circumstantial evidence is the notion, implicit in Plaintiffs' allegations, that the Fixing Banks at times acted against their own interests by quoting below-market prices leading up to the PM Fixing.  In spite of their argument that they may have all had a similar "client mix," Defs.' Mem. at 12, 27-28, the Fixing Banks' client orders and proprietary trading positions could not have all moved in sync over the course of the Class Period.  *See In re LIBOR-Based Fin. Instruments Antitrust Litig.* (*In re LIBOR III*), 27 F. Supp. 3d 447, 469 (S.D.N.Y. 2014) ("[I]t is implausible that all defendants would maintain parallel trading positions . . . across the Class Period.").  As a result, the pattern of highly-correlated and below-market quotes presented by Plaintiffs, SAC ¶¶ 251-258, suggests that at least on some days one or more of the Fixing Banks quoted prices that were contrary to their interest on that day: for example, by agreeing to quote a below market price, despite having a net long position. *See Alaska Elec. Pension Fund*, 2016 WL 1241533, at *5 (S.D.N.Y. Mar. 28, 2016) (banks that allegedly conspired to manipulated ISDA benchmark rates against their economic self-interest by, *inter alia*, trading against their positions on certain days).  Taken together, Plaintiffs' allegations relative to the timing of the PM Fixing in connection with the observed price manipulation and the Fixing Banks' common motive and actions against self-interest are sufficiently plausibly to allege an unlawful agreement to restrain trade.

Defendants' arguments to the contrary are unpersuasive at this stage of the litigation. First, while the Court need not find that Plaintiffs' theory is the only plausible explanation for the observed downward price swings at the PM Fixing, the Fixing Banks' explanations as to why

this pattern simply reflects normal market conduct are not particularly persuasive.  For example, the Fixing Banks argue that downward price movements at the PM Fixing might be due to the fact that the PM Fixing takes place at "one of the most liquid times of the day,"  Defs.' Mem. at 9 (quoting Consolidated Am. Compl. Dkt. 27 ¶ 145), and therefore is an event that consistently attracts selling pressure from institutional gold miners and refiners, *id.* 9, 20-21, whereas buying interest tends to be more dispersed throughout the trading day, *id.* at 20-21.  Relatedly, the Fixing Banks' propose that they might have a similar client mix (including, for example, gold miners and refiners), which would lead them all to quote large sell orders around the PM Fixing.  Defs.' Mem. at 12, 27-28.  But, as Plaintiffs point out, the PM Fixing is not the only (or the most) liquid time of the trading day, SAC ¶¶ 175-76 & charts, and to the extent sellers are disproportionately interested in transacting at the Gold Fixing, one would expect to see a similar pattern of downward swings at the AM Fixing, which does not appear to be the case, *id.* ¶ 146 & chart.  In addition, Plaintiffs allege that, unlike at the AM Fixing (and other high volume trading periods), the "price impact" of quotes offered at the PM Fixing was actually higher in comparison to that of quotes offered during periods of lower liquidity.  *Id.* ¶¶ 186-88 & chart ("The power of a single quote to move the market should not peak during a purportedly highly liquid time of day.").  The Court is therefore not persuaded by the Fixing Banks' argument that the PM fixing was merely "different" as opposed to "anomalous."  Defs.' Mem. at 21.

The Fixing Banks argue that Plaintiffs' economic analyses cannot be relied upon because they are based on the work of "paid experts" who are improperly proffering expert opinions at the pleading stage.  Defs.' Mem. at 17-20 (citing cases).  The Court is not, however relying on Plaintiffs' *opinions* (expert or otherwise) but rather on Plaintiffs' factual assertions regarding pricing and other economic data, which courts generally accept at the pleading stage.  *See* Pls.'

Opp. at 13-15 & nn.18, 19, 21 (citing cases); *see also Carpenters Pension Trust Fund of St. Louis v. Barclays PLC.*, 750 F.3d 227, 234 n.8 (2d Cir. 2014) (relying on among other things plaintiff's expert economic analysis to show loss causation); *LIBOR I*, 935 F. Supp. 2d at 679-80, 716-17 (accepting plaintiffs' proffered analyses comparing whether banks rates were grouped and comparing LIBOR to other data); *Dover v. British Airways, PLC (UK)*, No. 12-cv-5567, 2014 WL 317845, at *2 (E.D.N.Y. Jan. 24, 2014) (noting that plaintiff's statistical analysis of prices "is a factual allegation that the Court must credit"); *Fed. Hous. Fin. Agency v. UBS Americas, Inc.*, 858 F. Supp. 2d 306, 332 (S.D.N.Y. 2012), *aff'd*, 712 F.3d 136 (2d Cir. 2013) (discussing plaintiffs' internal review of a sampled subset of loan files).  While courts may have discretion to reject such statistical analyses, Defendants have not cited a single case from this District in which a court has done so at the pleading stage.[30]  Moreover, disregarding all such analyses here would effectively foreclose Plaintiffs' ability to state an antitrust claim for manipulation of the Gold Fixing unless they had direct evidence, which is generally not required at the pleading stage.  *See Anderson News*, 680 F.3d at 183-84.  While the Court evaluates Plaintiffs' analysis-based allegations with as much scrutiny as any other, such allegations cannot be wholly disregarded.

     In short, the Court finds that Plaintiffs have plausibly alleged an antitrust conspiracy from 2006 through 2012 with respect to the Fixing Banks.  Plaintiffs adequately allege that the Fixing Banks, horizontal competitors in the relevant markets for physical gold and gold derivatives, conspired artificially to suppress the Fix Price, causing Plaintiffs to suffer losses on their Gold Investments.  Because Plaintiffs have sufficiently pled a *per se* violation, they "need not

---

[30]     The Fixing Banks cite to *Reed Const. Data Inc. v. McGraw-Hill Cos., Inc.*, 49 F. Supp. 3d 385, 399 (S.D.N.Y. 2014), and *Gen. Elec. Co. v. Joiner*, 522 U.S. 136, 145-46 (1997), but those decisions were based on pretrial and summary judgment motions to exclude expert testimony, not motions to dismiss.

separately plead harm to competition." *In re Foreign Exch. Benchmark Rates Antitrust Litig.*, 74

F. Supp. 3d at 594 (citing *Leegin Creative Leather Prods., Inc. v. PSKS, Inc.*, 551 U.S. 877, 886

(2007)).  The Fixing Banks' Motion to Dismiss Plaintiffs' antitrust claims is, therefore, denied

with respect to Plaintiffs' claim for conspiracy in restraint of trade from 2006 through 2012 and

otherwise granted with respect to the balance of the Class Period.

### V.      Plaintiffs Have Standing to Assert CEA Claims

Under section 22(a) of the CEA, a plaintiff has standing to bring a commodities

manipulation action only if he or she suffered "actual damages" as a result of a defendant's

manipulation.  7 U.S.C. § 25(a)(1).  To establish "actual damages" a plaintiff must show an

"actual injury caused by the violation," *LIBOR II*, 962 F. Supp. 2d at 620 (quoting *Ping He (Hai

Nam) Co. v. NonFerrous Metals (U.S.A.) Inc.,* 22 F. Supp. 2d 94, 107 (S.D.N.Y. 1998), *vacated

on other grounds,* 187 F.R.D. 121 (S.D.N.Y. 1999)).  Where, as here, CEA claims are based on

discrete, episodic instances of manipulation, plaintiffs must allege that they "engaged in a

transaction at a time during which prices were artificial as a result of defendants' alleged . . .

manipulative conduct, and that the artificiality was adverse to their position."  *Id.* at 622.

The Fixing Banks argue that Plaintiffs lack CEA standing because Plaintiffs fail to allege

that they "engaged in a transaction *at a time* during which prices were artificial."  Defs.' Mem. at

48 (citing *LIBOR II*, 962 F. Supp. 2d at 622 (emphasis added)).  But Plaintiffs allege that the

effects of Defendants' manipulation persisted beyond the PM Fixing window.  SAC ¶ 222 &

chart.  While Plaintiffs' allegations of "persistence" are potentially in tension with their

allegations that the PM Fixing marked a uniquely dysfunctional period of the trading day, they

are not necessarily incompatible.  Viewing the allegations in the light most favorable to

Plaintiffs, the Court could find that Plaintiffs have adequately alleged that, on days on which

Defendants engaged in manipulation, the Fixing marked an abrupt downward aberration in pricing, which abated gradually, but perhaps not completely, over time.

Under such circumstances, allegations that Plaintiffs sold gold futures on specifically identified dates on which Defendants are alleged to have artificially suppressed the Fix Price are sufficient for CEA standing purposes. *Compare In re Amaranth Natural Gas Commodities Litig.*, 269 F.R.D. 366, 379-80 (S.D.N.Y. 2010) (in the context of CEA class certification, "case law suggests that because plaintiffs transacted at artificial prices, injury may be presumed") *with LIBOR II*, 962 F. Supp. 2d at 620-21 (no standing where Plaintiffs failed plausibly to allege that they transacted on days on which prices were artificial or that the alleged artificiality was adverse to their positions).

### VI.    Plaintiffs Adequately Allege Price Manipulation

Plaintiffs assert claims under CEA Sections 9(a)(2) and 6(c)(3), 7 U.S.C. §§ 9(3), 13(a)(2), and CFTC Rule 180.2, which makes it unlawful for "any person to manipulate or attempt to manipulate the price of any commodity in interstate commerce."  Although manipulation claims that sound in fraud are evaluated under the more stringent pleading requirements of Fed. R. Civ. P. 9(b), *In re Amaranth Nat. Gas Commodities Litig.*, 730 F.3d 170, 180-81 (2d Cir. 2013), courts in this District have generally found that "fraud is not a necessary element of a market manipulation claim." *CFTC v. Wilson*, 27 F. Supp. 3d 517, 532 (S.D.N.Y. 2014) (citing *CFTC v. Parnon Energy Inc.*, 875 F. Supp. 2d 233, 244 (S.D.N.Y. 2012)).  In determining whether a particular manipulation claim raises allegations of fraud in the commodities context, courts typically employ a "case-by-case" approach. *See In re Amaranth Nat. Gas Commodities Litig.*, 730 F.3d at 181 (citing *Parnon,* 875 F. Supp. 2d at 244)); *CFTC v. Amaranth Advisors, L.L.C.*, 554 F. Supp. 2d 523, 530-31 (S.D.N.Y. 2008).

Although Plaintiffs characterize their claims as merely asserting market manipulation, the SAC alleges that the Fixing Banks submitted false and misleading auction bids and otherwise colluded to manipulate the Fix Price in order to gain an unfair trading advantage over other market participants; those allegations likely "sound in fraud." *See, e.g.*, *In re Crude Oil Commodity Litig.*, No. 06-cv-6677 (NRB), 2007 WL 1946553, at *5 (S.D.N.Y. June 28, 2007) (applying Rule 9(b) where "the crux of plaintiffs' allegations is that defendants misled the market with regard to supply and demand . . . resulting in artificial prices"); *see also LIBOR I*, 935 F. Supp. 2d at 713-14 (allegations that defendants "misled the market" by submitting artificial LIBOR quotes sound in fraud).  Although Plaintiffs also allege that Defendants engaged in manipulative trading strategies, which allegations may be subject to the more liberal Rule 8(a) standard, the Court need not determine which standard applies, because Plaintiffs have met their burden even under the more rigorous Rule 9(b) standard.  *See Ploss v. Kraft Foods Group, Inc. et al.*, 15-cv-2937, slip op. at 23-28 (N.D. Ill. June 27, 2016) (manipulation claims based on explicit misrepresentations sound in fraud and are subject to Rule 9(b), while those based solely on deceptive market activity may be subject to the more liberal Rule 8(a) standard).

In alleging fraud or mistake under Rule 9(b), "a party must state with particularity the circumstances constituting fraud or mistake."  Fed. R. Civ. P. 9(b).  This standard is generally relaxed in the context of manipulation-based claims, *ATSI Commc'ns, Inc. v. Shaar Fund, Ltd.,* 493 F.3d 87, 102 (2d Cir. 2007), where the complaint must simply specify "what manipulative acts were performed, which defendants performed them, when the manipulative acts were performed, and what effect the scheme had on the market for the securities at issue."  *In re Nat. Gas Commodity Litig.*, 358 F. Supp. 2d 336, 343 (S.D.N.Y. 2005) (citation and internal quotations omitted); *see also In re Amaranth Nat. Gas Commodities Litig.* (*Amaranth I*), 587 F.

Supp. 2d 513, 535 (S.D.N.Y. 2008).  While scienter "may be alleged generally," Fed. R. Civ. P.

9(b), Plaintiffs must allege facts that "give rise to a *strong inference* of scienter."  *In re Amaranth*

*Nat. Gas Commodities Litig.* (*Amaranth II*), 612 F. Supp. 2d 376, 384 (S.D.N.Y. 2009) (quoting

*Tellabs, Inc. v. Makor Issues & Rights, Ltd.,* 551 U.S. 308, 322-23 (2007) (emphasis in

*Amaranth II*)).

　　　To establish a claim for price manipulation under the CEA, Plaintiffs must allege that:

"(1) Defendants possessed an ability to influence market prices; (2) an artificial price existed; (3)

Defendants caused the artificial prices; and (4) Defendants specifically intended to cause the

artificial price."  *In re Amaranth Nat. Gas Commodities Litig.*, 730 F.3d at 173 (quoting *Hershey*

*v. Energy Transfer Partners, L.P.*, 610 F.3d 239, 247 (5th Cir. 2010)).  Because Plaintiffs'

allegations relative to intent, artificiality, and causation are interrelated, a separate discussion of

each element is something of an artificial exercise.  *See, e.g.*, *Wilson*, 27 F. Supp. 3d at 535

(noting how the elements of CEA manipulation claims occasionally overlap, such that they may

be factually and legally interdependent (citations omitted)).  In the interest of clarity, however,

the Court will address each element in turn.

　　　With respect to the first element, the Fixing Banks' only basis for disputing that they

possessed the ability to manipulate the gold futures market is that, although Plaintiffs allege

manipulation by collective action, they fail plausibly to allege the existence of a conspiracy.

Defs.' Mem. at 45 (citing *Apex Oil Co. v. DiMauro*, 822 F.2d 246, 261 (2d Cir. 1987)).  Because

the Court finds, for the reasons stated *supra*, that Plaintiffs *have* plausibly alleged a conspiracy,

and because the Fixing Banks were able to manipulate the gold futures market by virtue of their

respective roles as market makers and participants in the Fixing auction, this element has been satisfied.[31]

With regard to artificiality, viewing the allegations in the light most favorable to Plaintiffs, the Court finds that Plaintiffs have adequately pled the existence of artificial prices around the PM Fixing.  "An artificial price is a price that 'does not reflect basic forces of supply and demand.'"  *Parnon*, 875 F. Supp. 2d at 246 (quoting *In re Soybean Futures Litig.*, 892 F .Supp. 1025, 1044 (N.D. Ill. 1995)).  "When determining if artificial prices exist, a court may consider the underlying commodity's normal market forces, historical prices, supply and demand factors, price spreads, and also the cash market for the commodity at issue."  *In re Commodity Exch., Inc., Silver Futures & Options Trading Litig.* (*Silver I*), No. 11-md- 2213 (RPP), 2012 WL 6700236, at *12 (S.D.N.Y. Dec. 21, 2012) (citing *In re Sumitomo Copper Litig.*, 182 F.R.D. 85, 90 n.6 (S.D.N.Y. 1998)).

Here, while it is possible that the alleged seven-year pattern of downward price movement around the PM Fixing could be attributable to "the forces of supply and demand in the market," Defs.' Mem. at 44 (quoting *Silver I*, 2012 WL 6700236, at *12), Plaintiffs have plausibly pled that the distinctive pattern of downward price movement around the PM Fixing (which coincided with clustered below-market quotes by Defendants, and which did not occur at

---

[31]     The Court further notes that the Fixing Banks' reliance on *DiMauro* is misplaced.  In *DiMauro*, the Second Circuit merely held that, at the summary judgment stage, in the absence of any evidence of a conspiracy, plaintiffs could not proceed on a theory that each defendant could alone have manipulated the market because a complaint that "alleges collective action . . . cannot be allowed to proceed as if it alleges individual action."  *DiMauro*, 822 F.2d at 261.  The Court does not read *DiMauro* as establishing an additional pleading element for plaintiffs alleging market manipulation claims based on concerted action.  As other courts have acknowledged, the ability to influence a particular market is a fact-intensive determination and one that is not typically ripe for disposition at the pleading stage.  *Parnon*, 875 F. Supp. 2d at 245.

any other time of the day, or at high-liquidity periods in other markets)[32] is caused by an outside

artificial influence.  SAC ¶¶ 116-57, 250-67.[33]  As discussed further *supra*, Defendants fail to

offer a more plausible explanation for this phenomenon of downward price swings, and the

Fixing Banks' argument that these allegedly "dysfunctional" pricing dynamics must have been

the result of natural market forces because they occurred simultaneously in the spot and ETF

market, Defs.' Mem. at 44, is circular.  Because Plaintiffs allege that variations in the Fix Price

had a simultaneous impact on prices in the spot, ETF, and futures markets, the co-occurrence of

anomalous pricing behavior in the spot and ETF markets around the PM Fixing does not render

similar activity in the futures markets benign.  In any event, at the pleading stage, the Court may

not pick and choose among plausible explanations and must assume that Plaintiffs' well-pled

allegations are true, regardless of whether they are probable.  *Parnon*, 875 F. Supp. 2d at 247-48

(citing *Anderson News*, 680 F.3d at 185).

  With regard to scienter, Plaintiffs must show, at a minimum, that Defendants "acted (or

failed to act) with the purpose or conscious object of causing or [a]ffecting a price or price trend

in the market that did not reflect the legitimate forces of supply and demand."  *Silver I*, 2012 WL

6700236, at *10 (quoting *Parnon*, 875 F. Supp. 2d at 249 (internal quotation marks omitted));

*see also In re Amaranth Nat. Gas Commodities Litig.*, 730 F.3d at 183 ("There is thus no

manipulation without intent to cause artificial prices.").  Specific intent to manipulate prices can

be pled by "alleging facts (1) showing that the defendants had both motive and opportunity to

commit the fraud or (2) constituting strong circumstantial evidence of conscious misbehavior or

---

[32]  While the SAC alleges that this pattern is not common in other markets, SAC ¶¶ 172-189, similar
allegations of anomalous pricing behavior have been made with respect to the market for silver bullion.  *See In re
London Silver Fixing Antitrust Litig.*, No. 14-md-0253 (VEC) (S.D.N.Y.).

[33]  For the reasons stated in footnote 24, *supra*, Plaintiffs have not plausibly alleged a pattern of price
manipulation prior to 2006 or after 2012.

recklessness." *Amaranth I*, 587 F. Supp. 2d at 530 (quoting *ATSI*, 493 F.3d at 99 (other citations omitted)).  Here, Plaintiffs' allegations meet both standards.

As described more fully, *supra*, Plaintiffs allege that the Fixing Banks were motivated to manipulate the Gold Fix because doing so allowed them to create an arbitrage condition in the futures market on which they were able to profitably trade during the Fixing window.[34]  *See Amaranth I*, 587 F. Supp. 2d at 530 ("Sufficient motive allegations entail concrete benefits that could be realized by one or more of the false statements and wrongful nondisclosures alleged." (*quoting Kalnit v. Eichler,* 264 F.3d 131, 139 (2d Cir. 2001)).  The Fixing Banks also had the opportunity to manipulate the Fix Price by virtue of their role as major market makers and Fixing participants, which Defendants do not appear to contest.  *See Laydon*, 2014 WL 1280464, at *5 (S.D.N.Y. Mar. 28, 2014) (defendants' roles as, *inter alia*, Euroyen TIBOR and/or Yen–LIBOR "Contributor Banks" was sufficient to plead opportunity).

Plaintiffs also plausibly allege that each of the Fixing Banks acted recklessly in creating artificial price dynamics in the gold markets around the PM Fixing.  "[Courts] have found allegations of recklessness to be sufficient where plaintiffs alleged facts demonstrating that defendants failed to review or check information that they had a duty to monitor, or ignored obvious signs of fraud."  *See Amaranth II*, 612 F. Supp. 2d at 383-84 (quoting *Novak v. Kasaks*, 216 F.3d 300, 308 (2d Cir. 2000)).  "The inquiry . . . is whether *all* of the facts alleged, taken collectively, give rise to a *strong inference* of scienter, not whether any individual allegation,

---

[34]     The Fixing Members' arguments to the contrary are not so much inaccurate as they are off point.  Defs.' Mem. at 38-42.  As described *supra* the Court agrees that Plaintiffs' allegations regarding the Defendants' unhedged short positions are not well-pleaded, and even if they were, they would be insufficient to establish a motive for price manipulation under the CEA.  *See In re Crude Oil Commodity Litig.*, 2007 WL 1946553, at *8 (a "generalized [profit] motive" is "insufficient to show intent" because it "could be imputed to any corporation with a large market presence in any commodity market") (citations omitted).

scrutinized in isolation, meets that standard." *Tellabs, Inc.*, 551 U.S. at 322-23 (emphasis supplied).

As discussed *supra*, Plaintiffs have plausibly alleged that the Fixing Banks conspired to manipulate the Fix Price around the PM Fixing. As the sole contributors to the Fixing auction, the Fixing Banks were no doubt aware of their ability to influence the Fix Price (both individually and collectively), which, in turn, affected gold futures markets.  Therefore, the Fixing Banks could not have acted accidentally (or even negligently) in submitting artificially low Fixing bids over a seven-year period. *See LIBOR III,* 27 F. Supp. 3d 447 at 470  (intent element satisfied under a conscious misbehavior or recklessness theory based on evidence that defendants had submitted artificial LIBOR quotes and the "danger" of submitting artificial quotes "was either known to the defendant banks or so obvious that they must have been aware of it").  Plaintiffs' allegations are therefore sufficient to plead scienter.[35]

Finally, Plaintiffs have adequately pled that the Fixing Banks' alleged misconduct was the "proximate cause of the price artificiality." *Silver I*, WL 6700236, at *16 (citations omitted). In particular, while the parties debate the role of external market forces, Plaintiffs adequately allege that changes in the Fix Price had an immediate effect on pricing in the gold markets. Plaintiffs have identified a significant number of days on which anomalous downward pricing swings occurred uniquely around the PM Fixing, when the Defendants were quoting below-

---

[35]     While the Court agrees with Defendants that Plaintiffs' claims are considerably weaker than those raised in other benchmark fixing cases, the Fixing Banks' suggestion that reckless intent cannot be alleged without direct evidence is incorrect.  Defs.' Mem. at 42-43.  *See* Fed. R. Civ. P. 9(b) ("Malice, intent, knowledge, and other conditions of a person's mind may be alleged generally."); *see also In re Amaranth Nat. Gas Commodities Litig.*, 730 F.3d at 185 (evidence of trading behavior involving "wait[ing] until the final minutes of trading to sell large quantities of a particular future" could "strongly suggest" manipulation).  Because "proof of intent will most often be circumstantial in nature, manipulative intent must normally be shown inferentially from the conduct of the accused."  *Parnon*, 875 F. Supp. 2d at 249 (quoting *In re Ind. Farm Bureau Coop. Ass'n,* No. 75–14, 1982 WL 30249, at *7 (CFTC Dec. 17, 1982)).

market gold prices[36] and the Fixing Banks were on the phone discussing net order information.

Taken individually, none of these allegations would be sufficient but together (and combined

with Plaintiffs' allegations regarding artificiality and intent) they plausibly allege that the Fixing

Banks' conduct was at least one cause of the alleged artificial pricing around the PM Fixing. *See*

*Parnon*, 875 F. Supp. 2d at 248 ("'It is enough, for purposes of a finding of manipulation . . . that

respondents' action contributed to the price [movement].'" (quoting *In re Kosuga,* 19 Agric.

Dec. 603, 624 (1960)).  At the pleading stage, the Court may not pick and choose among

plausible explanations and must assume that Plaintiffs' well-pled allegations are true, regardless

of whether they are probable. *Anderson News,* 680 F.3d at 185.  The Fixing Banks' Motion to

Dismiss Plaintiffs' price manipulation claims is, therefore, denied.

### VII.   Plaintiffs Adequately Allege Manipulative Device Claims After August 15, 2011

Plaintiffs bring claims under CEA Sections 6(c)(1) and 9(a)(2), 7 U.S.C. §§ 9(1), 13(a)(2)

and CFTC Rule 180.1, which make it unlawful for any person to "use or employ . . . in

connection with any swap, or a contract of sale of any commodity . . . any manipulative or

deceptive device or contrivance, in contravention of [CFTC rules and regulations]," 7 U.S.C. §

9(1), or to: "[m]ake, or attempt to make, any untrue or misleading statement of a material fact or

to omit to state a material fact necessary in order to make the statements made not untrue or

misleading" 17 C.F.R. § 180.1(a)(2); "[e]ngage, or attempt to engage, in any act, practice, or

course of business, which operates or would operate as a fraud or deceit upon any person" *id.*

§ 180.1(a)(3); or "[d]eliver or cause to be delivered . . . a false or misleading or inaccurate report

---

[36]     The Fixing Banks contend that no inference of causation can be drawn because Defendants are only alleged
to have quoted prices that were, on average, .007% lower than those quoted by others in the market.  Defs.' Mem. at
44 (citing SAC ¶ 263).  But Plaintiffs do not allege that the Defendants suppressed the Fix Price every day; rather
they allege that the Defendants engaged in manipulation on specified days when anomalous price swings were
observed around the PM Fixing.  Therefore, the Court's analysis does not depend on Defendants' "average" trading
activity, but rather Defendants' trading around the PM Fixing on days when the Fix Price was allegedly
manipulated.

concerning . . . market information or conditions that affect or tend to affect the price of any commodity in interstate commerce . . . ," *id.* § 180.1(a)(4).  While the phrase "manipulative or deceptive device or contrivance" is not defined by statute or regulation, CFTC precedent notes that: "the operative phrase[,] 'manipulative or deceptive device or contrivance,' is virtually identical to the terms used in section 10(b) of the Securities Exchange Act of 1934."  *In re Total Gas & Power N. Am., Inc.*, CFTC No. 16-03, 2015 WL 8296610, at *8 (Dec. 7, 2015) (quoting Prohibition on the Employment, or Attempted Employment, of Manipulative and Deceptive Devices and Prohibition on Price Manipulation, 76 Fed. Reg. 41398-01, 41,399 (July 14, 2011) (to be codified at 17 C.F.R. pt. 180)) (the "Prohibition on Manipulative and Deceptive Devices"). Because of "the differences between the securities markets and the derivatives markets," however, the CFTC has stated that it is "guided, but not controlled, by the substantial body of judicial precedent applying the comparable language of SEC Rule 10b-5."  *Id.*

The Fixing Banks argue that because Rule 180.1 did not become effective until August 15, 2011, Plaintiffs' manipulative device claim based on pre-August 15, 2011 conduct must be dismissed.  Defs.' Mem. at 46.  The Court agrees.  *See In re Amaranth Nat. Gas Commodities Litig.*, 730 F.3d at 173 n.1 (noting that Rule 180.1 "does not impact the present appeal . . . given the regulation's effective date of August 15, 2011 (citations omitted)); *see also In re Barclays PLC, Barclays Bank PLC, and Barclays Capital Inc.*, CFTC No. 15-25, 2015 WL 2445060, at *14 (CFTC May 20, 2015) (differentiating between conduct occurring pre- and post-August 15, 2011 for purposes of Rule 180.1).  To the extent Plaintiffs assert pre-August 15, 2011 manipulation claims based on false reporting and other deceptive trading activities pursuant to Section 9(a)(2), 7 U.S.C. § 13(a)(2), and Rule 180.2, the Court has already denied the Fixing Banks' Motion to Dismiss with respect to such claims.  *See* Section VI, *supra*.  But that finding

does not permit Plaintiffs to bootstrap their pre-August 15, 2011 manipulative device claims into claims under Sections 6(c)(1), 7 U.S.C. § 9(1), and Rule 180.1.  Therefore Plaintiffs' manipulative device claims based on pre-August 15, 2011 conduct are dismissed.

With respect to Plaintiffs' claims based on conduct occurring on or after August 15, 2011, the Fixing Banks argue that Plaintiffs fail to allege: (1) a manipulative act, (2) performed in connection with a swap, or contract of sale of a commodity, (3) scienter, (4) reliance, (5) economic loss, and (6) loss causation.  Defs.' Mem. at 46 (citing securities cases).  For the reasons articulated *supra*, Plaintiffs have satisfied their burden to allege that the Fixing Banks engaged in manipulative acts in connection with the sale of commodities, scienter,[37] and economic loss.  With respect to the remaining elements of reliance and loss causation, Plaintiffs argue that reliance, in particular, is not an element of a CEA claim (as to opposed to claims for securities fraud).  Pls.' Opp. at 45.

While the case law is scarce on this point, the Court finds that, under the circumstances of these consolidated actions, Plaintiffs have satisfied their pleading burden.  In *Ploss*, the court assumed that misrepresentation-based claims require reliance and loss causation to be alleged separately and with particularity, 15-cv-2937, slip op. at 25-26, while manipulation-based claims merely require that "the market relies on the transactions to signal true, rather than manipulative, demand," *id.* at 30 n.11, and that the alleged manipulation had a sufficient impact on the relevant market, *id.* at 25-26.  In *In re Crude Oil Commodity Futures Litigation*, the court held that, at least in the context of manipulation-based claims, as to which the effects of the alleged

---

[37]    The Court notes that, in contrast to Plaintiffs' price manipulation claims, Plaintiffs' manipulative device claims under Section 6(c)(1) and 17 C.F.R. 180.1 require scienter to be proven by intentional or reckless conduct. *See* 17 C.F.R. § 180.1(a); Prohibition on Manipulative and Deceptive Devices, 76 Fed. Reg. at 41,404; *CFTC v. Kraft Foods Grp., Inc.*, 153 F. Supp. 3d 996, 1014-15 (N.D. Ill. 2015), *motion to certify appeal denied*, No. 15 C 2881, 2016 WL 3907027 (N.D. Ill. July 19, 2016).  Because the Court has already found that Plaintiffs alleged strong circumstantial evidence of conscious misbehavior or recklessness, this element has been adequately alleged.

manipulation presumably dissipate over time, loss causation is not required. 913 F. Supp. 2d 41, 60-61 (S.D.N.Y. 2012); *see also In re Platinum and Palladium Commodities Litig.*, 828 F. Supp. 2d 588, 600-01 (S.D.N.Y. 2011) (loss causation principles were not applicable to a CEA claim involving a manipulative "bang the close" trading strategy). Here, Plaintiffs have alleged both misrepresentations (*i.e.*, the Fixing Banks' misstatements regarding their supply and demand for gold in the context of the PM Fixing) and manipulation (*i.e.*, the Fixing Banks' quoting and trading practices leading up to and during the PM Fixing call) as part of a single scheme. Accordingly, at the pleading stage, and specifically in the context of this benchmark manipulation case, the Court finds that Plaintiffs have satisfied their burden by alleging with particularity "the nature, purpose, and effect of the fraudulent conduct and the roles of the defendants." *ATSI*, 493 F.3d at 101; *cf. Laydon*, 2014 WL 1280464, at *5-6 (denying defendants' motion to dismiss plaintiff's CEA claims based on alleged Euroyen TIBOR and Yen–LIBOR manipulation without separately addressing reliance and loss causation).

## VIII.   Plaintiffs Adequately Allege Aiding and Abetting and Principal-Agent Liability

Section 22 of the Commodity Exchange Act creates liability for any person "who willfully aids, abets, counsels, induces, or procures the commission of a violation" of the CEA. 7 U.S.C. § 25(a)(1). A claim for aiding and abetting liability under the CEA requires that the defendant "associate himself with the venture, that he participate in it as in something that he wishes to bring about, that he seek by his action to make it succeed." *In re Amaranth Nat. Gas Commodities Litig.*, 730 F.3d at 182 (quoting *United States v. Peoni*, 100 F.2d 401, 402 (2d Cir. 1938)).

As previously described, Plaintiffs adequately allege that, as participants in the Fixing auction, the Fixing Banks unlawfully conspired to manipulate gold prices and restrain trade. *See*

Section IV, *supra.*  Plaintiffs' conspiracy allegations, particularly with respect to anomalous price movements that occurred uniquely at the PM Fixing, the Fixing Banks' below-market price quotes leading up to the PM Fixing, their private communications during the Fixing auction, and their common motive to manipulate the Fixing for commercial gain are sufficient to state an aiding and abetting claim.  *See Laydon*, 2014 WL 1280464, at *6 (denying motion to dismiss aiding and abetting claim based on "numerous allegations giving rise to an inference that Defendants knew of the other Defendants' unlawful and manipulative conduct and assisted each other in the furtherance of the violation").  The Fixing Banks' Motion to Dismiss Plaintiffs' aiding and abetting claim is, therefore, denied.

Plaintiffs' claim for principal-agent liability is also well-pled.  The liability of a principal for the acts of its agents is governed by Section 2(a)(1)(B) of the CEA.  7 U.S.C. § 2(a)(1)(B).  Under that provision, a claim for principal-agent liability requires that the agent was acting in the capacity of an agent when he or she committed the unlawful acts and that the agent's actions were within the scope of his or her employment.  *Guttman v. CFTC*, 197 F.3d 33, 39 (2d Cir. 1999); *see also In re Nat. Gas. Commodity Litig.* 337 F. Supp. 2d 498, 515 (S.D.N.Y. 2004) (Section 2(a)(1)(B) codifies a "variant" of common law respondeat superior) (quoting *Rosenthal & Co. v. CFTC*, 802 F.2d 963, 966 (7th Cir. 1986)).  The SAC's allegations of information sharing and manipulation of the Fix Price necessarily imply the involvement of as-yet unnamed traders and other Fixing Bank employees.  *See* SAC ¶¶ 57, 75 (naming unidentified individual co-conspirators as defendants and alleging that all actions taking by the Defendants were "by or through its [agents] . . . while they were actively engaged in the management, direction, control, or transaction of the [Defendants'] business or affairs."), 370-72 (alleging that Defendants are liable for the manipulative acts of employees within the scope of their employment).  There is no

indication, at this stage, that these employees acted on a lark or in any way outside the scope of their employment.  *See In re Foreign Exch. Benchmark Rates Antitrust Litig.*, No. 13-cv-7789 (LGS), Slip Op. at 49-50 (S.D.N.Y. Sept. 20, 2016) (denying motion to dismiss principal-agent claims where there was no suggestion that "any trader was operating outside the scope of his employment when engaging in the alleged conduct").  In fact, the SAC alleges that these bad acts were highly profitable for the principals, the Fixing Banks, *see* Part III.BD, *supra.*  These allegations are adequate at this stage to allege plausibly principal-agent liability. [38]  The Fixing Banks' motion to dismiss Plaintiffs' principal-agent claim is, therefore, denied.

## IX.    Statute of Limitations and Tolling

### A.  Plaintiffs' CEA Claims

CEA claims must be brought "not later than two years after the date the cause of action arises."  7 U.S.C. § 25(c).  Because the CEA does not define when a cause of action accrues, "courts apply a 'discovery accrual rule' wherein 'discovery of the injury, not discovery of the other elements of a claim, is what starts the clock.'"  *LIBOR I*, 935 F. Supp. 2d at 697 (quoting *Koch v. Christie's Int'l PLC,* 699 F.3d 141, 148-49 (2d Cir. 2012) (other citations omitted)).  "'Inquiry notice'—often called 'storm warnings' in the securities context—gives rise to a duty of inquiry 'when the circumstances would suggest to an investor of ordinary intelligence the probability that she has been defrauded.'"  *Koch*, 699 F.3d at 151 (quoting *Lentell v. Merrill Lynch & Co.*, 396 F.3d 161, 168 (2d Cir. 2005)).

---

[38]    The SAC's relatively thin principal-agent allegations reflect in part the posture of this case.  None of the individual defendants, presumably employees of the Fixing Banks, has been identified, and there has been no document discovery.  Assuming this case reaches the summary judgment stage, Plaintiffs will be required to adduce significantly more evidence establishing that agents of the Fixing Banks violated the CEA and did so acting within the scope of their employment.

The Fixing Banks argue that Plaintiffs were on "inquiry notice" of a potential conspiracy before the Class Period began because of the "structural design" of the Fixing.  Defs.' Mem. at 49 n.22.  But just as these structural elements were not sufficient to constitute "plus factors" in support of Plaintiffs' conspiracy claims, neither are they sufficient to put Plaintiffs on inquiry notice of a conspiracy.  The Fixing Banks further imply that Plaintiffs could have previously detected anomalous downward price swings at the PM Fixing, but they present no facts suggesting that such information was publicly available (or even imaginable to investors prior to the revelation of other benchmark fixing schemes), while Plaintiffs contend that this pattern was only discernable based on their analysis of "thousands of days of historical pricing data."  Pls.' Opp. at 48.

Based on the SAC, it appears that Plaintiffs would not have been on inquiry notice of the alleged manipulation prior to May 2014, when Deutsche Bank withdrew as a member of the LGMF, or at the earliest at some point in 2013, when "regulators across the globe began investigating benchmarking practices."  SAC ¶ 129.  Either way, because Plaintiffs' CEA claims were filed within two years of the discovery date, the Fixing Banks' Motion to Dismiss based on the statute of limitations is denied.

### B.  Plaintiffs' Antitrust Claims

Plaintiffs' antitrust claims are subject to a four-year statute of limitations.  *See* 15 U.S.C. § 15b.  Plaintiffs argue that the statute of limitations should be tolled here due to Defendants' fraudulent concealment.  Pls.' Opp. at 48-49.  To show fraudulent concealment, "an antitrust plaintiff must prove (1) that the defendant concealed the existence of the antitrust violation[;] (2) that plaintiff remained in ignorance of the violation until sometime within the . . . statute of limitations; and (3) that his continuing ignorance was not the result of lack of diligence."  *In re*

*Nine West Shoes Antitrust Litig.*, 80 F. Supp. 2d 181, 192 (S.D.N.Y. 2000) (quoting *Klehr v. A.O.*

*Smith Corp.*, 521 U.S. 179, 189 (1997)).   "A claim of fraudulent concealment must be pled with

particularity, in accordance with the heightened pleading standards of Rule 9(b)."   *Hinds Cty.,*

*Miss. v. Wachovia Bank N.A.*, 700 F. Supp. 2d 378, 3999 (S.D.N.Y. 2010).   At the same time,

because resolution of a claim of fraudulent concealment is "intimately bound up with the facts of

the case," it often cannot be decided at the motion to dismiss stage.   *Id.* (quoting *In re Mercedes–*

*Benz Anti–Trust Litig.,* 157 F. Supp. 2d 355, 374 (D.N.J. 2001)).

As to the first factor, a plaintiff may prove concealment by showing "either that the

defendant took affirmative steps to prevent the plaintiff's discovery of his claim or injury or that

the wrong itself was of such a nature as to be self-concealing."   *State of N.Y. v. Hendrickson*

*Bros.*, 840 F.2d 1065, 1083-84 (2d Cir. 1988).   Here, the Fixing Banks' alleged manipulation and

misrepresentation of the Fix Price was, by its nature, self-concealing.   *See id.* ("The passing off

of a sham article as one that is genuine is an inherently self-concealing fraud, whether what is

passed off is a fake vase sold as a real antique . . . or a collusive bid purporting to reflect genuine

competition." (internal citations omitted)); *see also Nine West Shoes,* 80 F. Supp. 2d at 193

("[B]y alleging a price-fixing scheme, the plaintiff sufficiently has alleged the first prong of

fraudulent concealment . . . .").   Thus, Plaintiffs have satisfied the first element.

As for the second element, as described *supra*, Plaintiffs have adequately alleged that

they remained ignorant of the alleged manipulative scheme until a point of time within the

statute of limitations.   *Cf. In re Sumitomo Copper Litig.*, 120 F. Supp. 2d 328, 346-47 (S.D.N.Y.

2000) (noting that dismissal at the pleading stage, and even summary judgment, is often

inappropriate on issues of constructive knowledge that typically "depend on inferences drawn

from the facts of each particular case" (citations omitted)).

With respect to the third element, a "plaintiff will prove reasonable diligence either by showing that: (a) the circumstances were such that a reasonable person would not have thought to investigate, or (b) the plaintiff's attempted investigation was thwarted."  *See In re Publ'n Paper Antitrust Litig.*, No. 304-md-1631 (SRU), 2005 WL 2175139, at *5 (D. Conn. Sept. 7, 2005). While Plaintiffs' allegations regarding due diligence are thin, the filing of the first complaint in this consolidated action on March 3, 2014, several months prior to Deutsche Bank's withdrawal from the LGMF, and their rapid assembly of data analyses in support of their consolidated complaint (and amendments thereto) sufficiently demonstrates due diligence for purposes of withstanding the Fixing Banks' Motion to Dismiss. The Court therefore finds that Plaintiffs have adequately alleged tolling; at the pleading stage, the Court need not determine the precise contours of the applicable tolling period.

## X.        Plaintiffs' Unjust Enrichment Claim Fails

Under New York law, a claim for unjust enrichment requires that "'(1) [the] defendant was enriched, (2) at plaintiff's expense, and (3) equity and good conscience militate against permitting defendant to retain what plaintiff is seeking to recover.'"  *Diesel Props S.r.l. v. Greystone Bus. Credit II LLC,* 631 F.3d 42, 55 (2d Cir. 2011) (citations omitted).  The "essence" of such a claim "is that one party has received money or a benefit at the expense of another." *Kaye v. Grossman*, 202 F.3d 611, 616 (2d Cir. 2000) (quoting *City of Syracuse v. R.A.C. Holding, Inc.,* 685 N.Y.S.2d 381 (4th Dep't 1999)).  As a result, courts require proof that the defendant received a "specific and direct benefit" from the property sought to be recovered, rather than an "indirect benefit."  *Id*.  While the plaintiff "need not be in privity with the defendant to state a claim for unjust enrichment," neither can the relationship between the parties be "too attenuated to support such a claim."  *Sperry v. Crompton Corp.*, 8 N.Y.3d 204, 215-16

(2007); *see also Reading Int'l, Inc. v. Oaktree Capital Mgmt.*, 317 F. Supp. 2d 301, 334

(S.D.N.Y. 2003) (an unjust enrichment claim "requires some type of direct dealing or actual,

substantive relationship with a defendant" (quoting *Redtail Leasing, Inc. v. Bellezza*, No. 95-

5191 (JFK) 1997 WL 6034965, at * 8 (S.D.N.Y. Sept. 30, 1997)).

　　　The Fixing Banks argue that Plaintiffs' unjust enrichment claim fails because Plaintiffs

have not alleged that they had any "relevant relationship" with the Defendants or that Defendants

received any benefit to which they were not entitled at Plaintiffs' expense.  Defs.' Mem. at 49.

Plaintiffs counter that their unjust enrichment claim meets the relevant standard because their

claim is "*expressly limited* to transactions 'in which a Defendant or its affiliate was in a direct or

quasi-contractual relationship with a Class Member.'"  Pls.' Opp. at 46 (quoting SAC ¶ 377).

While Plaintiffs concede that none of the named Plaintiffs alleges a "direct transaction[]" with

any of the Defendants, they argue this is irrelevant because "class representatives may be able to

sue defendants who did not injure any of them directly by employing the 'juridical link'

doctrine."  Pls.' Opp. at 46 (quoting Newberg on Class Actions § 2:5 (5th Ed.)).

The "juridical link" doctrine has been adopted in various ways by other circuits, *see, e.g.*,

*Payton v. Cnty. of Kane*, 308 F.3d 673, 678-82 (7th Cir. 2002); *Fallick v. Nationwide Mut. Ins.

Co.*, 162 F.3d 410, 423-24 (6th Cir. 1998), but the Second Circuit has rejected this doctrine,

stating that "a plaintiff must demonstrate standing for each claim [s]he seeks to press."  *Mahon v.

Ticor Title Ins. Co.*, 683 F.3d 59, 64 (2d Cir. 2012) (quoting *DaimlerChrysler Corp. v. Cuno*,

547 U.S. 332, 335 (2006)); *see also Lewis v. Casey*, 518 U.S. 343, 357 (1996) ("'That a suit may

be a class action . . . adds nothing to the question of standing, for even named plaintiffs who

represent a class must allege and show that they personally have been injured, not that injury has

been suffered by other, unidentified members of the class to which they belong and which they

purport to represent.'" (quoting *Simon v. E. Ky. Welfare Rights Org.*, 426 U.S. 26, 40 n.20 (1976)

(alterations in *Lewis*)).  And, while the Second Circuit's decision in *NECA-IBEW Health &*

*Welfare Fund v. Goldman Sachs & Co.*, 693 F.3d 145, 167-68 (2d Cir. 2012) (holding that class

plaintiffs had standing to assert claims on behalf of class members who invested in mortgage-

backed securities in which plaintiffs did not invest, but which were "backed by mortgages

originated by the same lenders that originated the mortgages backing plaintiff's certificates") may

express some "willingness to liberalize concepts of 'standing,'" Pls.' Opp. at 47 n.69, it falls far

short of expanding standing to encompass Plaintiffs' unjust enrichment claims against

Defendants with whom Plaintiffs have no direct relationship.  The Court therefore agrees with

Defendants.  Because Plaintiffs have failed to allege that they had any relevant relationship with

the Defendants or that Defendants were enriched at Plaintiffs' expense, the SAC fails to state a

claim for unjust enrichment.  *See, e.g.*, *Bazak Int'l Corp. v. Tarrant Apparel Grp.*, 347 F. Supp.

2d 1, 4 (S.D.N.Y. 2004) ("A 'complaint does not state a cause of action in unjust enrichment if it

fails to allege that defendant received something of value which belongs to the plaintiff.'"

(quoting 22A N.Y. Jur.2d. Contracts § 515)); *Laydon*, 2014 WL 1280464, at *13-14 (conclusory

assertions that defendants "financially benefited from the unlawful manipulation" and that

"[t]hese unlawful acts caused [p]laintiff . . . to suffer injury," were insufficient); *LIBOR I*, 935 F.

Supp. 2d at 737-38 (same); *see also Amaranth I,* 587 F. Supp. 2d at 547 (dismissing unjust

enrichment claim based on alleged market manipulation that had an impact on the price of

natural gas futures contracts because Plaintiffs did not "allege[] any direct relationship, trading or

otherwise, between themselves and any [Defendant]"); *Georgia Malone & Co. v. Rieder*, 19

N.Y.3d 511, 516-19 (2012) (where Plaintiff and Defendant "simply had no dealings with each

other," their relationship is "too attenuated" to support an unjust enrichment claim).  The Fixing

Banks' Motion to Dismiss is therefore granted with respect to Plaintiffs' claim for unjust enrichment, and Plaintiffs' unjust enrichment claim is dismissed.

**XI.**      **Plaintiffs Fail to State a Claim Against UBS**

Each of Plaintiffs' claims is based upon their premise that the Fixing Banks improperly used their private daily Fixing call to conspire to suppress gold prices.  Because UBS was not a Fixing Bank and never participated in the PM Fixing, and because Plaintiffs fail to allege that UBS caused Plaintiffs' injuries, whether acting separately or in concert with the Fixing Banks, Plaintiffs fail to state a claim against UBS.

With respect to Plaintiffs' antitrust claims, Plaintiffs fail to allege parallel conduct, circumstantial evidence, or plus factors suggesting that UBS had an agreement with the Fixing Banks to manipulate the Fixing.  UBS was not a party to the Gold Fixing calls, and Plaintiffs fail to identify a single communication between UBS and the Fixing Banks suggestive of manipulative conduct.  The fact that UBS is a market maker and a large bullion bank does not constitute circumstantial evidence of misconduct; such allegations could apply to any number of large banks, none of which is (or could be) named as defendants on that basis.  Finally, while FINMA fined UBS for misconduct in the FX and precious metals markets, nothing in FINMA's findings plausibly supports Plaintiffs' conspiracy allegations here.  In particular, FINMA's findings that UBS shared order information with "third parties" and engaged in front-running and other conduct against its clients' interests, does not support Plaintiffs' allegation that UBS conspired with the Fixing Banks (or others) to manipulate the Gold Fixing.  SAC ¶¶ 301-02.

At best, Plaintiffs allege that UBS engaged in parallel conduct by offering (along with the Fixing Banks) below-market quotes that coincided with downward swings in the price of gold around the PM Fixing.  SAC ¶¶ 250-67.  But allegations of parallel conduct "must be placed in a

context that raises a suggestion of a preceding agreement, not merely parallel conduct that could just as well be independent action." *Twombly*, 550 U.S. at 557; *see also In re Elevator Antitrust Litig.*, 502 F.3d at 51 ("[S]imilar pricing can suggest competition at least as plausibly as it can suggest anticompetitive conspiracy."). In the absence of any other circumstantial evidence or plus factors, Plaintiffs' allegations that UBS quoted prices that were lower than market averages around the PM Fixing are simply inadequate to create a plausible inference of conspiracy.

Plaintiffs' CEA claims fail for similar reasons. Both Plaintiffs' price manipulation and manipulative device claims require allegations that UBS caused (and intended to cause) the artificial price in question. *In re Amaranth Nat. Gas Commodities Litig.*, 730 F.3d at 173. Because Plaintiffs have failed to allege plausibly that UBS played a role in the Fixing Banks' conspiracy to suppress gold prices, Plaintiffs cannot establish that UBS caused (and intended to cause) the downward price manipulation at issue.[39] Likewise, because Plaintiffs have not alleged any (non-conclusory) facts suggesting that UBS intentionally associated itself with and participated in the Fixing Banks' scheme, their aiding and abetting and principal-agent claims fail as well. *See id.* 182 (proof of unlawful intent required for aiding and abetting liability under the CEA). Plaintiffs' claim against UBS for unjust enrichment is likewise dismissed for the same reasons articulated above with respect to the Fixing Banks.

---

[39]     Notably, Plaintiffs do not claim to be clients of UBS who suffered losses as a result of UBS front-running their orders or triggering their stop loss orders. *See* SAC ¶¶ 301-02. Rather Plaintiffs allege that they "suffered harm in respect of the sales they conducted where the relevant sales price was artificially lowered by collusive manipulation" by the Defendants' in connection with the PM Fixing. SAC ¶¶ 323-28.

### XII.    Plaintiffs Have Sufficiently Alleged Personal Jurisdiction over LGMF

Plaintiffs allege that the Court has personal jurisdiction over LGMF as an alter ego of the Fixing Banks.  Pl.'s Opp. LGMF at 1, 6, 9.  LGMF does not dispute that the Fixing Banks are subject to the Court's personal jurisdiction but contends that Plaintiffs have not adequately alleged that LGMF is their alter ego.  Moreover, it argues, personal jurisdiction based on an alter ego theory is inconsistent with the Due Process Clause in light of the Supreme Court's recent decision in *Daimler AG v. Bauman*, __ U.S. __, 134 S. Ct. 746 (2014).  LGMF Mem. at 4-9.  As explained below, *Daimler* does not support LGMF's position, and, at this stage in the proceedings, Plaintiffs have adequately pled that LGMF acted as the alter ego of the Fixing Banks.  Accordingly, personal jurisdiction is proper, and LGMF's motion is denied.

Plaintiffs bear the burden of establishing personal jurisdiction.  When no discovery has taken place, however, a plaintiff need only make a *prima facie* showing of jurisdiction—through "legally sufficient allegations"—to survive a Rule 12(b)(2) motion.  *In re Parmalat Sec. Litig.*, 376 F. Supp. 2d 449, 452 (S.D.N.Y. 2005).  The Court will construe "all pleadings and affidavits in the light most favorable to the plaintiff" and resolve "all doubts in the plaintiff's favor." *Penguin Group (USA) Inc. v. American Buddha*, 609 F.3d 30, 34 (2d Cir. 2010) (citations omitted).  On the other hand, the Court need not accept either party's legal conclusions as true, nor will it draw "argumentative inferences" in either party's favor.  *See Licci ex rel. Licci v. Lebanese Canadian Bank, SAL*, 673 F.3d 50, 59 (2d Cir. 2012).

Plaintiffs contend that the Court has personal jurisdiction over the Fixing Banks (and LGMF) under Federal Rules of Civil Procedure 4(k)(1) and 4(k)(2) or under the Sherman Act and the CEA.  Pl.'s Mem. Opp. LGMF at 5, 8, 9.  LGMF concedes that personal jurisdiction under the CEA extends to the fullest extent permitted by the Due Process Clause.  LGMF Mem.

at 2-3; *Amaranth I,* 587 F. Supp. 2d at 526 (CEA extends personal jurisdiction to limits of Due

Process Clause).[40]  Thus, personal jurisdiction over LGMF is proper so long as it comports with

due process.  Because LGMF concedes that personal jurisdiction over the Fixing Banks is

proper, personal jurisdiction over LGMF comports with due process so long as the alter ego

theory of jurisdiction is viable and Plaintiffs have adequately pled that LGMF is an alter ego of

the Fixing Banks.[41]

  The Second Circuit has consistently recognized that "it is compatible with due process

for a court to exercise personal jurisdiction over an individual or a corporation . . . when the

individual or corporation is an alter ego or successor of a corporation that would be subject to

personal jurisdiction in that court."  *Transfield ER Cape Ltd. v. Indus. Carries, Inc.*, 571 F.3d

221, 224 (2d Cir. 2009) (quoting *Patin v. Thoroughbred Power Boats*, 294 F.3d 640, 653 (5th

Cir. 2002)); *Int'l Equity Invs., Inc. v. Opportunity Equity Partners, Ltd.*, 475 F. Supp. 2d 456,

458-460 (S.D.N.Y. 2007) (personal jurisdiction established on alter-ego theory); *cf. Wm.*

*Passalacqua Builders, Inc. v. Resnick Developers South, Inc.*, 933 F.2d 131, 142-43 (2d Cir.

1991) (affirming diversity jurisdiction premised in part on alter ego relationship between

parties).

---

[40] Citing *Daniel v. Am. Bd. of Emergency Medicine*, 428 F.3d 408, 423 (2d Cir. 2005), LGMF asserts that
statutory personal jurisdiction under the Sherman Act—and seemingly under the CEA—is proper only if Plaintiffs
can show that venue is proper because "LGMF is 'an inhabitant,' 'may be found,' or 'transacts business' in this
district."  LGMF Mem. at 3.  This argument is at best a red herring.  *Daniel* requires a plaintiff establishing
jurisdiction under the Sherman Act to also satisfy the coordinate venue provision quoted-above.  *Daniel*, 428 F.3d at
423.  The jurisdictional provision of the CEA, 7 U.S.C. § 25, is phrased differently and has not been interpreted to
require plaintiffs to also satisfy the CEA's parallel venue provision.  *See In re Libor-Based Fin. Instruments*
*Antitrust Litig.*, No. 11-md-2262 (NRB), 2015 WL 6696407, at *19 n.28.  Thus, Plaintiffs need not satisfy the venue
provision of the CEA (or the Clayton Act) for personal jurisdiction to be proper under the CEA, and, as Plaintiffs
explain, personal jurisdiction under the CEA is adequate to establish supplementary jurisdiction over Plaintiffs'
other claims.  Pl.'s Mem. Opp. LGMF at 8 n.12.

[41] Because the Court concludes that LGMF is the Fixing Banks' alter ego it need not reach Plaintiffs'
arguments that personal jurisdiction is proper under a "conspiracy jurisdiction" theory.  Pls.' Opp. LGMF at 7-8.  It
also is unnecessary to consider the parties arguments regarding the application of Federal Rules of Civil Procedure
4(k)(1) and 4(k)(2).

While it is true that in *Daimler*, the Supreme Court "expressed doubts as to the usefulness of an *agency* analysis," *Sonera Holding B.V. v. Cukurova Holding A.S.*, 750 F.3d 221, 225 (2d Cir. 2014) (emphasis supplied), the *Daimler* opinion does not call into question the alter-ego theory of jurisdiction asserted by Plaintiffs here. In *Daimler*, the Supreme Court expressed skepticism regarding the relevance of an agency relationship to assertions of general jurisdiction. *See Daimler*, 134 S. Ct. at 759. The Ninth Circuit general jurisdiction test at issue permitted a court to impute a "subsidiary's jurisdictional contacts" if those activities were "important" to the parent. *Id.* The Supreme Court contrasted the Ninth Circuit's "less rigorous test" with the more common standard, applicable here, that requires a showing that the subsidiary was "so dominated by the [parent] as to be its alter ego." *Id.* The Supreme Court's concern regarding the Ninth Circuit's "sprawling view of general jurisdiction," *id.*, does not apply where there are allegations that the subsidiary was in fact the alter ego of a corporation over which jurisdiction is proper.[42] *See NYKCool A.B. v. Pac. Int'l Servs., Inc.*, 66 F. Supp. 3d 385, 392–93 (S.D.N.Y. 2014) (rejecting argument that *Daimler* extends to alter-ego jurisdiction). The Court agrees with Plaintiffs that the alter ego theory of jurisdiction is viable.

In order plausibly to allege that LGMF was the Fixing Banks' alter ego, Plaintiffs must show: (1) that "the [Fixing Banks] exercised complete domination over [LGMF] with respect to the transaction at issue," and (2) that "such domination was used to commit a fraud or wrong that injured the [Plaintiffs]." *Lakah v. UBS AG*, 996 F. Supp. 2d 250, 260 (S.D.N.Y. 2014) (quoting *MAG Portfolio Consultant, GMBH v. Merlin Biomed Grp. LLC,* 268 F.3d 58, 63 (2d Cir. 2001)

---

[42]    Moreover, the Supreme Court made clear that an agency relationship remains relevant to assertions of specific jurisdiction. *Id.* at 759 n.13.

(internal quotation marks omitted)).[43]  This standard is "relaxed where the alter ego theory is used not to impose liability, but merely to establish jurisdiction."  *Int'l Equity Invs., Inc.*, 475 F. Supp. 2d at 459 (citing *Marine Midland Bank, N.A. v. Miller,* 664 F.2d 899, 904 (2d Cir. 1981)). In the jurisdictional context, a plaintiff need only show that the "allegedly controlled entity 'was a shell' for the allegedly controlling party."  *Id.*

At this stage, Plaintiffs have adequately alleged that LGMF is the alter ego of the Fixing Banks.  This conclusion follows from the Court's finding *supra* that Plaintiffs have plausibly alleged—albeit barely—that the Fixing Banks engaged in a conspiracy to manipulate the Fix Price between January 1, 2006 and December 31, 2012.  According to the SAC, this scheme operated around and through the PM Fixing call administered by LGMF.  The SAC alleges that the PM Fixing call was the perfect locus for the Fixing Banks' scheme because it was a seemingly-legitimate opportunity for the Fixing Banks to share information necessary to their collusion.  SAC ¶¶ 74, 201.  Moreover, the SAC alleges that it was through the Fix Price, set by the Fixing Banks on LGMF's behalf, that the Fixing Banks ultimately profited from their manipulation.  *Id.* ¶¶ 222, 228-32.

While Plaintiffs' evidence of the Fixing Banks' "domination" of LGMF is less persuasive, it is adequate at the pleading stage.  New York courts consider a number of indicia in order to determine whether one entity dominated another such that the corporate form should be

---

[43]      While LGMF suggests that English law may govern whether the Court may pierce LGMF's corporate veil, LGMF has not provided any indication that there is a "true conflict of laws" between English law and New York law on this point.  In the absence of a true conflict, the Court will apply New York law.  *See Int'l Equity Invs., Inc.*, 475 F. Supp. 2d at 458-59 (applying New York law to veil-piercing analysis in the absence of any identified conflict between New York and English law).  Likewise, although Plaintiffs suggest that Federal common law, rather than New York law may govern, there is no discernable difference with respect to the issues here.  *See Wajilam Exports (Singapore) Pte. Ltd. v. ATL Shipping Ltd.,* 475 F. Supp. 2d 275, 284 n.10 (S.D.N.Y. 2006) (Federal common law and New York law of veil-piercing are not "meaningfully" distinct); *see also Lakah,* 996 F. Supp. 2d at 260 ("the Second Circuit's common law standard [for veil piercing] is taken directly from New York law").

disregarded, including *inter alia*: "the failure to observe corporate formality; inadequate capitalization; intermingling of personal and corporate funds; the sharing of common office space, address and telephone numbers of the alleged dominating entity and the subject corporation; an overlap of ownership, directors, officers or personnel; the use of the corporation as a means to perpetrate the wrongful act against the plaintiff." *Miramax Film Corp. v. Abraham*, No. 01-cv-5202 (GBD), 2003 WL 22832384, at *8 (S.D.N.Y. Nov. 25, 2003) (citing *Wm. Passalacqua Builders, Inc.,* 933 F.2d at 138)).

Several of these factors are allegedly present with respect to LGMF.  LGMF and the Fixing Banks have overlapping ownership and directors; the Fixing Banks are the *only* owners and directors of LGMF.  *See* SAC ¶ 73.  Plaintiffs have also alleged that LGMF is financially dependent on membership fees paid by the Fixing Banks and that LGMF has no real corporate headquarters or separate mailing address.  *Id.*; Pls.' Opp. LGMF at 3, Exs. 15-25.  LGMF disputes the extent to which LGMF is dependent on and controlled by the Fixing Banks, but at the pleading stage the Court assumes that these allegations are true.  Finally, and most critically, the wrongful acts plausibly alleged by Plaintiffs are themselves evidence of the Fixing Banks' domination of LGMF.  Chief among LGMF's corporate purposes is the "promotion, administration and conduct of the London Gold Market Fixings."  Pls.' Opp. LGMF Ex. 12 (LGMF Memorandum of Association) at 1.  The use of the PM Fixing as a disguise for market-manipulation is inconsistent with the "promotion" and "administration" of the PM Fixing and plainly contrary to LGMF's corporate purposes.  Plaintiffs will be required to supplement these allegations going forward—for instance by identifying the LGMF personnel that were purportedly involved in the operation of the PM Fixing and their nexus to the Fixing Banks conspiracy—but, these allegations are sufficient at the pleading stage.

## XIII.   Leave to Amend

Under Rule 15(a) of the Federal Rules of Civil Procedure, "[t]he court should freely give leave" to a party to amend its complaint "when justice so requires." Fed. R. Civ. P. 15(a)(2). "Leave may be denied 'for good reason, including futility, bad faith, undue delay, or undue prejudice to the opposing party.'" *TechnoMarine SA v. Giftports, Inc.*, 758 F.3d 493, 505 (2d Cir. 2014) (quoting *McCarthy v. Dun & Bradstreet Corp.,* 482 F.3d 184, 200 (2d Cir. 2007) (additional citations omitted)).  Ultimately, "the grant or denial of an opportunity to amend is within the discretion of the District Court." *Foman v. Davis,* 371 U.S. 178, 182 (1962).  Given the fact that Plaintiffs have already amended their Complaint twice and based on the parties' briefs and the arguments presented during oral argument, it appears that leave to amend may be futile.  Nevertheless, Plaintiffs shall have 14 days from the filing of this Opinion to show good cause why leave to file a Third Amended Complaint should be granted.

## CONCLUSION

For the foregoing reasons, UBS's Motion to DISMISS is GRANTED in its entirety.  The Fixing Banks' Motion to Dismiss is GRANTED IN PART and DENIED IN PART.  The Fixing Banks' Motion to Dismiss is GRANTED with respect to Plaintiffs' claim for unlawful restraint of trade from the beginning of the Class Period through December 31, 2005, and from January 1, 2013 through the end of the Class Period.  The Fixing Banks' Motion to Dismiss is further GRANTED with respect to Plaintiffs' manipulative device claims from the beginning of the Class Period to August 15, 2011, and with respect to Plaintiffs' claim for unjust enrichment.

The Fixing Banks' Motion to Dismiss is DENIED with respect to Plaintiffs' antitrust claims for unlawful restraint of trade from January 1, 2006 through December 13, 2012.  The Fixing Banks' Motion to Dismiss is further DENIED with respect to Plaintiffs' price

manipulation claims, Plaintiffs' manipulative device claims after August 15, 2011, and Plaintiffs' aiding and abetting and principal-agent liability claims.

LGMF's Motion to Dismiss is DENIED with respect to personal jurisdiction and is GRANTED IN PART and DENIED IN PART to the same extent as the Fixing Banks' Motion to Dismiss.  The Clerk of Court is respectfully directed to close the open motions at docket numbers 71, 73.  Plaintiffs' deadline to show good cause why leave to replead should be granted is **October 17, 2016**.

The parties must appear for a pretrial conference on **October 28, 2016 at 3:00 p.m.** in courtroom 443 of the Thurgood Marshall Courthouse, 40 Foley Square, New York, NY 10007. The parties, together with the parties in *In re Silver Fixing, Ltd., Antitrust Litig.,* No. 14-md-2573 (VEC), must meet and confer regarding a proposed schedule for discovery and class certification.  The parties are required to submit a joint proposal (if possible) or separate proposals (if a joint proposal is not possible) by October 21, 2016.  Within that submission the parties must address whether discovery in this case should be consolidated with discovery in *In re Silver Fixing, Ltd., Antitrust Litig.,* No. 14-md-2573 (VEC), and should include any other items they would like to discuss at the October 28, 2016 conference.


**SO ORDERED.**


Date:  October 3, 2016
　　　　New York, New York　　　　　　　　　　**VALERIE CAPRONI**
　　　　　　　　　　　　　　　　　　　　　　　　**United States District Judge**