USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:_____
DATE FILED: 05/06/2019

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------------- X
IN RE:                                                        :
                                                              :     14-MD-2548 (VEC)
COMMODITY EXCHANGE, INC., GOLD     :     14-MC-2548 (VEC)
FUTURES AND OPTIONS TRADING              :
LITIGATION                                                :     **OPINION AND ORDER**
                                                              :
*This Document Relates to All Actions*             :
-------------------------------------------------------------- X

VALERIE CAPRONI, United States District Judge:

These consolidated cases concern an alleged conspiracy to manipulate the price of gold and gold-denominated instruments during the class period of January 1, 2004 to December 31, 2012. *See* Third Amended Complaint (Dkt. 266) ¶ 406; Dkt. 377 at 1. Defendants are multinational financial institutions ("Fixing Banks") that perceive a conflict between their discovery obligations in this litigation and the bank secrecy laws in France, Singapore, England, and Wales. *See* Def. Letter (Dkt. 362) at 1, 3–4. In an ostensible effort to avoid disclosing any customer identifying information ("CII") in violation of foreign law, Defendants propose producing documents during discovery in pseudonymized or redacted form. Plaintiffs contend that foreign law does not conflict with Defendants' discovery obligations and, even if a conflict does exist, that this Court should not defer to foreign law under a comity analysis. *See* Pl. Opp. (Dkt. 366) at 3, 5. Defendants' motion for a protective order is granted in part and denied in part as set forth below.

## I.     Background

The Court will not recount the full history of this litigation here and will instead briefly describe the context of the discovery issues currently in contention.[1]

---

[1] For a detailed description of the underlying allegations and factual background, see *In re Commodity Exch., Inc.*, 213 F. Supp. 3d 631 (S.D.N.Y. 2016).

1

After much negotiation, the parties are now largely in agreement as to the appropriate scope of Defendants' document production. *See* Def. Letter (Dkt. 362) at 1.[2] The anticipated document production contains customer information, including customers' identities and their transaction data. *See* Def. Letter at 1. Defendants, however, argue that disclosure of CII would violate bank secrecy statutes in France and Singapore and common law obligations in England and Wales. *Id*. at 3–4.

Defendants have proposed what they view as a compromise that would allow them to meet their discovery obligations without violating foreign laws. Specifically, Defendants seek permission to pseudonymize customer names where possible and to redact identifying information where pseudonymization is impracticable. *Id*. at 2. Pseudonymization is not always feasible, because only electronically tabulated data, typically in the form of spreadsheets, contain CII that can be readily manipulated in a consistent way. *See id.* The electronically tabulated data in this case largely consists of transaction data, whereas other documents are a mix of emails, chat histories, and other materials that contain sporadic, non-uniform references to CII. *See id.*

Plaintiffs object to Defendants' proposed compromise, in part because pseudonymization and redaction may deprive readers of important context. Pl. Opp. at 1. Specifically, they argue that the combination of pseudonymization and redaction would prevent Plaintiffs from piecing together different documents that reference the same customer or account. Pl. Opp. at 2. Plaintiffs also object because pseudonymization would hinder their ability to demonstrate class-wide impact and provide class-wide notices. Pl. Opp. at 2–3. As to class-wide impact,

---

[2] The Court expresses its appreciation to the attorneys for all parties who have worked together cooperatively and collegially to resolve among themselves the logistics of the discovery in this case. The Court trusts that their successful collaboration will continue throughout the discovery in this matter.

2

Plaintiffs' primary concern appears to be that any given class member would be assigned a different pseudonym by each Defendant, preventing Plaintiffs from being able to compare or de-duplicate across datasets, including those obtained from other sources.[3] *See id.* at 3. Based on these concerns, Plaintiffs essentially argue that their interest in full production outweighs Defendants' interest in complying with foreign law, to the extent that such a conflict exists at all.

## II. Discussion

### A. Legal Framework

When foreign law is invoked as the basis for resisting discovery, the party resisting discovery bears the burden of "proving what the [foreign] law is and demonstrating why it impedes production." *S.E.C. v. Gibraltar Glob. Sec., Inc.*, No. 13-CV-2575, 2015 WL 1514746 at *2 (S.D.N.Y. 2015) (collecting cases). To meet that burden, the party must "provide the Court with information of sufficient particularity and specificity." *Alfadda v. Fenn*, 149 F.R.D. 28, 34 (S.D.N.Y. 1993).

If a court finds that there is an actual conflict between the discovery request and foreign law, the court must then perform a comity analysis to decide "the weight to be given to the foreign jurisdiction's law," balancing this country's national interests against those of the foreign jurisdiction. *Laydon v. Mizuho Bank, Ltd.*, 183 F. Supp. 3d 409, 413 (S.D.N.Y. 2016) (quotation marks and citations omitted). Courts in the Second Circuit consider a wide range of factors as part of the balancing test:

> (1) the importance to the investigation or litigation of the documents or other information requested;
>
> (2) the degree of specificity of the request;

---

[3] At the Court's direction, the parties have explored ways of generating consistent pseudonyms, which would enable Plaintiffs to track customer activity across datasets. Dkts. 390, 391. The available means of doing so appear to be prohibitive in terms of time and cost and would not enable Plaintiffs to cross-reference data provided by the Fixing Banks with documents obtained from third parties. *See* Tr. (Apr. 25, 2019 Hearing) at 6–10.

3

(3) whether the information originated in the United States;

(4) the availability of alternative means of securing the information;

(5) the extent to which noncompliance with the request would undermine important interests of the United States, or compliance with the request would undermine the important interests of the state where the information is located;

(6) the hardship of compliance on the party or witness from whom discovery is sought; and

(7) the good faith of the party resisting discovery.

*Laydon*, 183 F. Supp. 3d at 419–20 (citing *Wultz v. Bank of China Ltd.*, 910 F. Supp. 2d 548, 552–53 (S.D.N.Y. 2012)). Of those factors, "the competing interests of the countries involved and the hardship imposed by compliance" are generally the most important. *Minpeco, S.A. v. Conticommodity Servs., Inc.*, 116 F.R.D. 517, 522 (S.D.N.Y. 1987) (collecting cases).

**B.     Application**

    **1.     Conflict with Foreign Law**

Defendants claim conflicts with bank secrecy laws in France, Singapore, England, and Wales. As detailed below, the Court concludes that Defendants have adequately demonstrated that disclosure of CII would violate bank secrecy requirements in France and, in at least some circumstances, Singapore, but they have not demonstrated that disclosure would violate common law obligations in England and Wales.

    *a. France*

Defendant Société Générale (SG) has demonstrated with sufficient particularity and specificity that, as a French bank, it cannot disclose CII during civil discovery without violating French law. Specifically, Article L. 511-33 of the French Monetary and Financial Code imposes a duty of "professional secrecy" on any person who "is employed by" or "participates in the management or administration of" a French credit institution. Parleani Decl.

4

(Dkt. 362, Ex. A) ¶ 10. This duty of secrecy applies to any non-public information that would divulge the nature of an identifiable customer's business with a French bank. *See id.* ¶¶ 54–57. Protected information therefore includes transaction data, customer lists, account balances, and internal communications concerning customer activity that is connected to a customer's identity. *Id.* ¶ 52–53. Accordingly, there is no serious dispute that SG's document production will contain at least some information that is subject to the French duty of secrecy.

The French statute does contain exceptions, including for French criminal proceedings and French regulatory and tax authorities—but no exception exists for civil lawsuits, whether French or foreign. *Id.* ¶ 22. In addition to civil liability and regulatory discipline, a breach of the duty of secrecy is also punishable under the French Criminal Code, which provides for penalties of one year's imprisonment and a fine of €15,000. *Id.* ¶¶ 12–13, 39, 41 (quoting Article L. 571-4 and Article 226-13 of French Criminal Code). While Plaintiffs dispute the weight that this Court should give to French law under the comity analysis, such as by pointing out that the risk of actual prosecution and liability is low, Pl. Opp. at 5, there is no genuine dispute that SG has adequately supported its position that disclosure would violate French law.[4] Indeed, at the most

---

[4] Plaintiffs mischaracterize a case in which, purportedly, a court in the Second Circuit "[found] no conflict with the French Bank Secrecy Statute." *See* Pl. Opp. at 5. In *Strauss v. Credit Lyonnais, S.A.*, 242 F.R.D. 199 (E.D.N.Y 2007), the district court ruled in favor of disclosure but only after concluding that the French bank had "adequately supported its position that the discovery sought is indeed prohibited by foreign law." 242 F.R.D. at 207 (internal quotations and citation omitted).

Plaintiffs also cite a line of cases holding that the French duty of secrecy does not apply to cases in which the bank is a party. *See Alfadda v. Fenn*, No. 89-CV-6217, 1993 WL 33445, at *3 (S.D.N.Y. Feb. 1, 1993); *see also Bodner v. Paribas* 202 F.R.D. 370, 376 n.6 (E.D.N.Y. 2000). In this Court's view, SG has sufficiently demonstrated that this carveout applies only if the customer whose information is at issue is the bank's adversary in the relevant litigation. Parleani Decl. ¶ 28. Such a distinction makes imminent sense: a bank customer, to whom the bank owes a duty of confidence, could waive that duty in order to litigate a claim against the bank. *See Bodner*, 202 F.R.D. at 376 n.6 (noting that French bank secrecy law does not apply when bank is "party to the action brought against it *by the beneficiaries of the principle of banking secrecy rule*" (quoting expert declaration) (emphasis added)). Additionally, a bank, to defend itself against an adversarial customer, could in fairness rely on information concerning subject matter that the client has placed at issue, in the same way that an attorney may use privileged communications to defend against a malpractice action. In contrast, there is no apparent rationale for a broader

5

recent hearing on this issue after the submission of letter briefs, Plaintiffs conceded that SG may violate "the [French] law on its face" if SG were to comply with Plaintiffs' discovery demands. *See* Tr. (Hearing on Apr. 25, 2019) at 43.

    *b. Singapore*

Defendants have demonstrated with sufficient particularity and specificity that disclosure of CII would violate the Singapore Banking Act under limited circumstances. Specifically, the Singaporean prohibition applies only to disclosures by a bank's Singaporean branch or office (collectively "branch"), and to disclosures by a non-Singaporean branch if the disclosed information originated in a Singaporean branch and was transferred to the non-Singaporean branch via Part II of the Third Schedule of the Banking Act. Defendant Barclays has made an adequate showing that a subset of its documents is entitled to protection under Singaporean law; no other Defendant has done so.

Section 47 of the Singapore Banking Act prohibits the disclosure of "customer information" by "a bank in Singapore." Hai Decl. (Dkt. 362, Ex. B) ¶ 9; Bull Decl. (Dkt. 368) ¶ 13. Under Section 40A, "customer information" includes "any information relating to, or any particulars of, an account of a customer of the bank," a definition that clearly includes the customer identities and transaction data sought in this case. Hai Decl. ¶ 11 (noting exceptions for "deposit information" and "information that is not referable to any named customer or group of named customers"). Section 2(1) defines a "bank in Singapore" as either "a bank incorporated in Singapore" or the Singaporean branches of a bank incorporated outside Singapore. *Id.* ¶ 10; Bull Decl. ¶ 14. In this case, because no Defendant is incorporated in Singapore, the Court is only concerned with the documents that originate in one of Defendants' Singaporean branches.

---

carveout that would apply to *every* case in which a bank is a party to litigation, whether as a plaintiff or as a defendant.

Bull Decl. ¶ 15. Based on the parties' supplemental joint letter, the Court agrees with Plaintiffs that such documents will likely make up only a very small portion of the expected production and cannot justify wholesale redaction of documents regardless of origin.[5] *See* Dkt 382 at 4.

The Singapore Banking Act does not expressly contain an exception for compulsion by a foreign court order. Hai Decl. ¶¶ 22(g), 25–26. Plaintiffs' declaration also concedes that a confidentiality order preventing further disclosure, like the protective order already entered in this case, would not immunize a Singaporean bank from liability. Bull Decl. ¶ 36 ("Disclosure pursuant to the terms of a confidentiality order is not an exception to bank secrecy under Singapore law."). A breach of the statute is criminally punishable, by a fine up to S$125,000 or a term of imprisonment of up to three years. Hai Decl. ¶ 33.

If, however, a document otherwise protected from disclosure has been transferred out of Singapore, the Singapore Banking Act may not prohibit further disclosure by the non-Singaporean recipient. The parties' competing declarations agree that a recipient of a protected document transferred pursuant to Part I of the Third Schedule of the Banking Act may re-transmit that document without risk of liability, whereas a recipient of a protected document transferred pursuant to Part II may not. Hai Decl. ¶¶ 21–23; Bull Decl. ¶ 16, 36. Defendant Barclays has represented that its transaction data pertaining to Singaporean customers were transferred to London under Part II, which would prevent further disclosure absent another

---

[5] The Singaporean production will likely consist of documents from one Barclays custodian for a period of one year, a slice of transaction data for orders placed in Singapore, and incidental communications related thereto. *See* Dkt. 382 at 1–4. As Defendant Barclays has noted, most of its custodians are not based in Asia. Dkt. 382 at 2. Defendant Bank of Nova Scotia (BNS) further indicated that its branch in Singapore does not execute trades of precious metals and instead channels precious metals orders to its Hong Kong office, which suggests that a relatively small share of its gold-related activity actually originates in Singapore. *Id.* at 2. Additionally, Defendants BNS, SG, and HSBC do not anticipate any document collection efforts in Singapore, and SG and HSBC are not able to speak with specificity and certainty as to their Singaporean customers and their processes for executing their gold orders. *Id.* Consequently, the share of documents likely to be impacted by Singaporean law is minimal.

exception; other Defendants are silent as to how their Singaporean CII has come to reside outside of Singapore. Dkt 382 at 1–3.

Based on the foregoing, only Barclays has demonstrated with particularity and specificity that production of at least a subset of its anticipated responsive documents is prohibited by the Singapore Banking Act. Specifically, Barclays has met its burden as to the documents obtained from Singapore associated with the options trader referenced in the parties' joint letter, for the time that the trader was based in Singapore. *See* Dkt. 382 at 1. Barclays has also met its burden as to the transaction data or other documents transferred out of Singapore pursuant to Part II of the Third Schedule of the Banking Act. *See id.* Defendants' request to redact or pseudonymize in accordance with Singaporean law is denied in all other respects.

    *c. England and Wales*

Defendants have failed to show that the disclosure of materials from England and Wales would violate foreign law. Although Defendants have shown that the common law of England and Wales creates an implied contractual term of secrecy between a banker and a customer, they are unable to show that disclosure in this case would fall outside of recognized exceptions to the duty of secrecy; nor do they show that disclosure subject to a protective order would be inconsistent with that duty. *See* Tomlinson Decl. (Dkt. 367) at ¶ 3.

All parties agree that the common law duty of confidentiality has four exceptions. They are: customer consent, public duty, interests of the bank, and compulsion of law. Def. Letter at 4 (citing *Tournier v. Nat'l Provincial & Union Bank of England* [1924] 1 KB 461); Tomlinson Decl. ¶ 3 (citing Halsbury's Laws of England (Vo. 48, 2008, § 229)). Most relevant here are the public duty and compulsion of law exceptions. Defendants argue, without a supporting declaration, that ordinary civil lawsuits do not give rise to a public duty and that a foreign

8

subpoena is inadequate to constitute compulsion of law. Def. Letter at 4. On the other hand, Plaintiffs' declaration asserts that it is essentially hornbook law that a court order, including a foreign one, is sufficient to trigger both exceptions. Tomlinson Decl. ¶ 4–6. Plaintiffs' declaration further represents that, under the common law, the duty of confidentiality is separate from a legal claim of privilege, which is necessary to resist discovery, and that the common law duty of confidentiality would be adequately safeguarded by a protective order. *Id.* ¶ 6–8.

The Court agrees with Plaintiffs. The Court finds Defendants' argument that no public duty is triggered because this private litigation does not pertain to "massive international fraud" to be disingenuous. *See* Def. Letter at 4. If the allegations in this case are true, Defendants have engaged in a decade-long antitrust conspiracy to manipulate the global price of gold, distorting the free market to the detriment of potentially tens of thousands (if not hundreds of thousands) of individuals across the world. In terms of public interest, the scale is easily comparable to that of a "massive international fraud." Defendants have also failed to establish that a federal court order necessarily falls short of the legal compulsion exception. *See* Tomlinson Decl. ¶ 5 (noting that Defendants' only authority on this point, *X Ag v. A Bank* [1983] 2 All ER 464, is distinguishable on due process grounds). Nor have Defendants demonstrated that the customers' interest in confidentiality would not be adequately preserved by the protective order in this case.

In short, Defendants have not met their burden to demonstrate, with "particularity and specificity," that their discovery obligations are in conflict with English or Welsh common law. *See Fenn*, 149 F.R.D. 28 at 34. As such, Defendants must proceed with discovery without regard to any duty of confidentiality created by the common law of England and Wales.

9

## 2. Comity Analysis

Because Defendants have adequately demonstrated a conflict between French law and SG's discovery obligations and between Singaporean law and a small subset of Barclays' document production, the Court must next determine whether to accommodate the relevant foreign laws under the comity analysis. As a starting point, the Court notes that Defendants are not seeking to block discovery altogether, but merely to pseudonymize where possible, or redact where pseudonymization is infeasible, their clients' identity. Plaintiffs' primary contention is that Defendants' risk of prosecution and liability in a foreign jurisdiction is likely to be low, which reduces Defendants' hardship of compliance with discovery. While that may be accurate, this Court will not require Defendants, who are acting in good faith, to mass-produce CII held in foreign jurisdictions in violation of foreign law, unless Plaintiffs demonstrate a specific need for that information.

Several of the comity factors weigh in Defendants' favor. First, there is no dispute that most of the information at issue in this case is of foreign origin, which favors deference to the law of the jurisdiction in which the information was created or is currently being held. Pl. Opp. at 7 ("Plaintiffs concede that much of the information they seek originates outside of the United States. Thus, this factor may weigh in favor of granting deference to foreign laws."). Second, as to the specificity of Plaintiffs' request, the Court finds it difficult to characterize the requests in this matter as "highly specific." *See* Pl. Opp. at 6. While it may be true that, ordinarily, a request for unredacted versions of agreed upon production may be considered a specific request, the Court cannot ignore the fact that the requests in this case likely sweep in thousands of customers and essentially all of those customers' account information over a decade-long period; to engage in massive understatement, the production of documents in this case is likely to

include enormous amounts of otherwise private information that is irrelevant to the case. *See Minpeco*, 116 F.R.D. at 528, 530 (declining to compel production in part because "given the wide scope of plaintiffs' requests and interrogatories, compliance by [the bank] is very likely to yield much material that plaintiffs will not find useful in this litigation"); *cf. Royal Park Investments SA/NV v. Deutsche Bank Nat'l Tr. Co.*, No. 14-CV-4394, 2017 WL 7512815, at *10 (S.D.N.Y. Dec. 29, 2017). Third, there is no indication that Defendants are acting in bad faith. *See* Pl. Opp. at 10.

The balance of national interests, ordinarily the most important factor, is not dispositive here. France and Singapore clearly have an interest in the application of their laws to banks operating within their jurisdictions; compliance with local laws provides certainty and predictability to those who do business with said banks.[6] *See Laydon*, 183 F. Supp. 3d at 423 (noting that foreign nations have interest in protecting privacy rights of their citizens); *see also Minpeco*, 116 F.R.D. at 523 (finding that codification of secrecy obligations into criminal law was indicative of substantial foreign interest). On the other hand, the United States also has an obvious interest in the application of federal law to discovery in its courts; compliance with federal procedural rules provides certainty and predictability to litigants in this country. *See Laydon*, 183 F. Supp. 3d at 423. Additionally, even in private litigation in which the United States government is not a party, the United States generally has a strong national interest in combatting antitrust and price manipulation conspiracies. *Minpeco*, 116 F.R.D. at 523–24 ("The strength of the congressional policies behind the antitrust and commodities laws is not open to

---

[6] Plaintiffs argue that the Court should discount French and Singaporean interests because they have not raised an objection to production in this case. While it is true that courts do often consider foreign governments' opposition or acquiescence to disclosure in particular cases, the lack of an apparent objection from France or Singapore is not especially probative here, because nothing in the record indicates that the governments were informed of this litigation (by either party) or otherwise had an opportunity to weigh in. *See Alfadda*, 149 F.R.D. at 34–35 (noting that defendants gave Swiss government opportunity to express view on disclosure and that Swiss government declined to take position).

11

question."); *In re Air Cargo Shipping Servs. Antitrust Litig.*, 278 F.R.D. 51, 54 (E.D.N.Y. 2010) ("[E]nforcement through private civil actions . . . is a critical tool for encouraging compliance with the country's antitrust laws."). The strength of the United States' interest in this case, however, depends substantially on whether Defendants' customer names are actually material to Plaintiffs' efforts to enforce this nation's antitrust and commodities laws and, if so, whether that information can be obtained through alternative means. *Laydon*, 183 F. Supp. 3d at 423 (noting that interest of United States grows stronger when "the discovery sought is vital to the litigation" (internal quotation marks and citation omitted)); *In re Payment Card Interchange Fee & Merch. Disc. Antitrust Litig.*, No. 05-MD-1720, 2010 WL 3420517, at *9 (E.D.N.Y. Aug. 27, 2010) (noting that "strength of the national interest in disclosure depends largely on . . . the importance of the contested documents to this litigation" when interest of United States is primarily private enforcement of antitrust law).

The outcome of the comity analysis therefore turns on the relevance of the CII and its importance to this action. *See Milliken & Co. v. Bank of China*, 758 F. Supp. 2d 238, 247 (S.D.N.Y. 2010) ("[I]t is necessary [] to judge the degree of importance of the information— where it falls on the spectrum between merely relevant at one end and crucial at the other—and then weigh this along with all the other factors."). The affected documents, generally transaction data and bank communications regarding gold or gold-related trades, are clearly relevant, but to overcome the comity factors in Defendants' favor, Plaintiffs must show specifically that the identities of customers, which is the only information that Defendants intend to withhold, are relevant and important to the case. And in particular, Plaintiffs must show that they have a need for the customer names contained in SG's document production and Barclays' Singaporean documents, notwithstanding the voluminous, unredacted production that Plaintiffs are otherwise

receiving. *See Trade Dev. Bank v. Cont'l Ins. Co.*, 469 F.2d 35, 41 (2d Cir. 1972) (affirming decision not to compel disclosure of customer identities and noting that "the relative unimportance of the information as to the clients' identity in the present proceeding was entitled to be considered").

Plaintiffs object to Defendants' proposed pseudonymization of tabulated data and anonymization of other documents because the proposal interferes with Plaintiffs' ability to cross-reference potential evidence.[7] In particular, a pseudonym provided by one bank cannot be matched against a pseudonym generated by another bank, even when they refer to the same person or entity; nor can a pseudonym in a spreadsheet be linked to a redacted communication. *See* Pl. Opp. at 2–3.

The Court agrees with Plaintiffs that, generally speaking, the ability to piece together different documents about the same customer or account may lead to relevant evidence, and that de-duplicating class members across datasets may aid in determining the percentage of class members affected by Defendants' actions. *See* Pl. Opp. at 3; *In re Air Cargo Shipping Servs. Antitrust Litig.*, No. 06-MD-1175, 2014 WL 7882100, at *55 (E.D.N.Y. Oct. 15, 2014) ("Though Rule 23 permits the possibility that some class members went un-impacted, the court still needs some assurance that these putative class members are relatively few in number."). Nonetheless,

---

[7] Plaintiffs also claim that CII is necessary for purposes of providing class notices under Federal Rule 23(c)(2)(B) of Civil Procedure. The Court finds any dispute over notice to be premature. If a class is certified in this case, the parties can work together on devising a method to provide notice to potential class members.

Similarly, Plaintiffs argue that Defendants may have an unfair advantage in this litigation if Defendants oppose class certification on the basis that Plaintiffs cannot show that class members suffered a net loss as a result of Defendants' manipulation of gold prices. *See* Pl. Opp. at 2 n.2. As the parties have described it, this netting issue could arise if a potential class member has multiple accounts across different banks, generating gains and losses that may need to be offset to determine the class member's actual injury. If and when Defendants make such an argument, the comity analysis would of course change, as Plaintiffs' need for non-anonymized transaction data would increase. The Court, however, finds no need to require, at this time, disclosure on the basis of a hypothetical response to a potential argument that Defendants have not yet tried to make.

there are indications that Plaintiffs' need for customer names in this case is less than compelling. First, the parties in the sister case involving silver trading, which is also before this Court and is premised on essentially the same circumstances as in this case, have agreed to proceed with discovery without disclosure of CII. *See* Tr. at 19. Additionally, as Defendants have pointed out, the Antitrust Division of the Department of Justice closed its Fixing-related investigations without requiring the Fixing Banks to disclose CII. *See* Tr. at 36; Def. Letter at 8–9.

Under the circumstances of this case, the Court concludes that Plaintiffs' stated interests in obtaining CII do not justify wholesale disclosure of SG's client names or Barclays' Singaporean customers. First, to the extent that Plaintiffs are interested in the customer information referenced in SG's and Barclays' non-tabulated documents, which consist largely of chat transcripts and other communications, Plaintiffs will already have access to a majority of those documents in unredacted form, because the recipients of those messages, *e.g.*, other Fixing Banks, have no basis to redact or pseudonymize the customer information communicated to them by SG or Barclays. To the extent that there are internal communications that reference specific customers, those are unlikely to be probative of an inter-bank conspiracy—or, if Plaintiffs do identify redacted documents that are particularly probative, they can request SG or Barclays to provide the unredacted version of those documents.[8]

Second, as to Plaintiffs' professed need to de-duplicate customers across all Defendants to determine class-wide impact, the Court finds that wholesale disclosure of CII by Barclays (as to Singaporean customers) and SG is unnecessary in light of the other CII to which Plaintiffs

---

[8] As to these targeted requests, the balancing of the comity factors may weigh in Plaintiffs' favor. First, when making such requests, Plaintiffs will presumably be able point to specific documents and concrete circumstances that make clear the relevance of the particular customer's identity to the case. Additionally, a bank's limited disclosure of information for selected accounts is far less likely to result in prosecution or liability than wholesale disclosure of CII.

14

have full access.  Because Plaintiffs will have unredacted materials from Bank of Nova Scotia, HSBC, and Barclays (minus Singaporean accounts), Plaintiffs' experts can already perform much if not most of the desired de-duplication.  Based on those results, the parties' experts can likely estimate the number of duplicates that would be found if SG's clients and Barclay's Singapore clients were added to the mix.

Finally, to the extent that Plaintiffs encounter redacted, non-tabulated documents of particular interest that need to be matched with pseudonymized transaction data, the Court concludes that Plaintiffs may make a reasonable number of requests to Defendants SG and Barclays to provide the pseudonym(s) associated with the customer(s) referenced in the non-tabulated document(s).  Given the nature of the discovery in this case, the Court finds it too burdensome to require Defendants to pseudonymize every account reference contained in each and every document, particularly because the vast majority of customer and account references are likely to be of no utility to Plaintiffs.

In sum, the Court finds that, under the comity analysis, Defendants SG and Barclays should not be required to disclose CII in violation of foreign law unless Plaintiffs demonstrate a particular need for the disclosure.  Although the Court finds that Plaintiffs have failed to articulate a sufficient need for the wholesale disclosure of CII, the Court concludes that Plaintiffs may make specific requests for disclosure after receiving the partially pseudonymized and partially redacted production from SG and Barclays.  The parties must meet-and-confer in good faith to resolve any disputes over any targeted disclosures and to bring any intractable disputes to the Court's attention.

### III. Conclusion

For the reasons discussed above, as to electronically tabulated data, Defendant SG is GRANTED leave to pseudonymize customer identity information from such datasets; Defendant Barclays is GRANTED leave to pseudonymize customer identity information from such datasets, to the extent that such information originated in Singapore and was transferred outside of Singapore pursuant to Part II of the Third Schedule of the Singapore Banking Act. As to the remaining documents that are not available in tabulated form, Defendants Barclays (only as to Singaporean documents produced by the sole Singapore-based custodian or transferred outside of Singapore pursuant to Part II of the Third Schedule of the Singapore Banking Act) and SG are GRANTED leave to redact customer identity information from their production, subject to a reasonable number of requests from Plaintiffs for disclosure of the pseudonym(s) associated with the customer(s) referenced in those documents. If after reviewing a pseudonymized or redacted document, Plaintiffs can articulate a specific need for the disclosure of the customer's identity, Plaintiffs may request that Defendants SG or Barclays produce the unredacted version of the document. Such requests must be reasonable in number, and the parties are directed to bring any disputes to the Court's attention if they cannot be resolved after a good-faith meet-and-confer.

As to all other documents, Defendants' request to redact or pseudonymize, including for purposes of complying with the common law of England and Wales, is DENIED.

At the oral argument on this motion, the parties informed the Court that, despite their best efforts, the discovery schedule previously entered in this case, Dkt. 327, needs to be adjusted. The parties are directed to meet and confer and to submit an agreed-upon modification of the schedule by **May 17, 2019**.

The Clerk of Court is respectfully directed to close the open motion at docket entry 362.

**SO ORDERED.**

**Date: May 6, 2019**
**New York, NY**

‎ **VALERIE CAPRONI**
**United States District Judge**